226 N.J. Super. 132 (1988)
543 A.2d 985
PETER PROCANIK, AN INFANT BY HIS GUARDIAN AD LITEM, ROSEMARIE PROCANIK, PLAINTIFF, AND ROSEMARIE PROCANIK AND MICHAEL PROCANIK, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS, CROSS-APPELLANTS,
v.
JOSEPH PETER CILLO, HERBERT LANGER, ERNEST P. GREENBERG, AND HAROLD A. SHERMAN, DEFENDANTS, AND LEE S. GOLDSMITH AND GREENSTONE, GREENSTONE AND NAISHULER, A PROFESSIONAL CORPORATION, DEFENDANTS-APPELLANTS, CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 1988.
Decided June 30, 1988.
*134 Before Judges PRESSLER, BILDER and SKILLMAN.
Marc S. Friedman argued the cause for appellant-cross-respondent Lee S. Goldsmith (Kalb, Friedman and Siegelbaum, attorneys; Marc S. Friedman and Joel R. Glucksman, on the brief).
*135 Richard D. Catenacci argued the cause for appellant-cross-respondent Greenstone, Greenstone & Naishuler (Connell, Foley & Geiser, attorneys; Adrian M. Foley, Jr. and Richard D. Catenacci, of counsel; Richard D. Catenacci, Kevin R. Gardner and Brian T. Murnane, on the brief).
Myron W. Kronisch argued the cause for respondents-cross-appellants (Kronisch, Schkeeper & Lesser, attorneys; Myron W. Kronisch, of counsel and on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This case sounds in legal malpractice. Defendants Lee Goldsmith, an attorney at law of this state having special expertise in medical malpractice litigation, and Greenstone, Greenstone and Naishuler, the New Jersey firm with which he was associated at the time the operative events occurred, appeal from a jury verdict finding them liable to plaintiffs Rosemarie and Michael Procanik and their son Peter because of Goldsmith's alleged professional dereliction in failing to provide them with an adequate expression of his reasons for declining to represent them in their claims against Mrs. Procanik's obstetricians. We reverse. We conclude that this record does not raise a prima facie case of professional negligence against defendants and hence that the complaint should have been dismissed prior to its submission to the jury.
This case, as it is presently postured, comes to us by way of a tortuously complex route. The salient facts are, however, largely undisputed, and the following factual recitation is based on uncontested facts appearing in pretrial documents and adduced at trial.
The litigation arises out of the tragic circumstances of the birth on December 26, 1977 of a rubella-syndrome child, Peter Procanik, who by reason of his mother's German measles infection early in her pregnancy has grave vision and auditory disabilities, serious mental deficiencies, and a variety of other *136 physical and mental problems. His parents believed that Mrs. Procanik's obstetrician, defendant Joseph Cillo, who was in practice with defendants Herbert Langer and Ernest Greenberg, had negligently failed to realize that she had had German measles in her first month of pregnancy and had in fact advised her that the rash-producing illness which she had then suffered was not German measles. By so doing, she claimed, defendant Cillo deprived her of the opportunity for which she would have opted of terminating the pregnancy by voluntary abortion. Her prospective cause of action and that of the child were, consequently, those which have come to be known as wrongful birth and wrongful life.
Several months after Peter's birth, the Procaniks consulted Harold Sherman, a New Jersey attorney, with respect to their potential claims against the obstetricians. Although generally experienced in personal injury litigation, Sherman was not experienced in complex medical malpractice matters. He knew, however, of Goldsmith's expertise as the result of his attendance at a lecture on the subject given by Goldsmith, whose credentials include a medical degree earned prior to his law degree. In the fall of 1978 Sherman asked Goldsmith if he would be willing to represent the Procaniks in litigation against the obstetricians. Goldsmith expressed preliminary interest, making it clear, however, that he would have to make both a medical and legal evaluation before he could commit to the undertaking. Working with Sherman, the Procaniks' attorney, rather than with the Procaniks themselves, Goldsmith obtained the pertinent medical records and a statement from Mrs. Procanik asserting that she would have chosen to terminate the pregnancy had she known that she had had German measles. Goldsmith also submitted the medical information and his own precis of the case for evaluation and report to a medical expert, Dr. Leslie Iffy, a noted perinatologist and experienced forensic witness. In addition, he did legal research and discussed the case from time to time with the senior partners of the Greenstone firm.
*137 During the entire period in which this evaluation process was being conducted, the controlling law in this state was Gleitman v. Cosgrove, 49 N.J. 22 (1967), which had held that no cause of action on behalf of either parent or child lies based on the failure of a physician to advise the mother of a risk of a defective fetus provided the physician has neither caused nor contributed to the defect and provided he is without the capacity to remedy it. Goldsmith was, of course, aware of Gleitman. He also learned that on December 27, 1978 the New York Court of Appeals in Becker v. Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (Ct.App. 1978), overruled prior decisional law in that state by recognizing the parents' cause of action for wrongful birth but limiting their damages to those expenses incurred and to be incurred for the care and treatment of the child attributable to the child's congenital disabilities. The New York Court, however, refused to recognize either the parents' right to damages for emotional or psychic harm or the child's right to a cause of action for her "wrongful" life. Goldsmith was also aware, of course, that the United States Supreme Court's decision in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), permitting voluntary abortion during the first trimester of pregnancy at the mother's option, might have affected some of the underpinnings of the Gleitman ruling.[1] *138 He apparently hoped, therefore, that he could engage the interest of the Greenstone firm in accepting the case and, on January 29, 1979, wrote the following memorandum to the senior partners, Herbert E. Greenstone and Allen Naishuler, both now deceased:
We have, in the office, a Procanik file. This is a case in which a woman had a last menstrual period in May, measles at the end of May, then went to a gynecologist at the beginning of June; rubella test done, showed that she did have antibodies to it and apparently never informed of this so as to get an abortion. Gave birth to a deformed child in the following year.
This case would fall into the area of Gleitman v. Cosgrove, [49 N.J. 22] 227 Atlantic 2d 689. The decision in this case was in 1967, at a time when abortions were still illegal. The decision was 4 to 3, and was, in part, based on the fact that abortions were illegal.
Recently, in New York, (and a copy of this decision is enclosed) there were two cases decided, Becker v. Schwartz and Park v. Jessen [Chessin, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807], which in effect reverses Gleitman v. Cosgrove, and the New York case, Stuart v. Long Island Hospital. I think that now, at this time, it is an appropriate time to determine clearly whether or not we wish to take on Gleitman v. Cosgrove, going up to the Supreme Court. I think the time is right, and I think we have a good shot at reversal. The reason for the memo, then, is please read Becker v. Schwartz which is enclosed as well as Gleitman, so that we can discuss it and discuss our options. The damages are heavy.
About a month after he wrote that memorandum, Goldsmith received Dr. Iffy's report, about which we will have more to say hereafter. At the time Dr. Iffy's report arrived, Goldsmith and Greenstone were trying a case in a distant county, and it was not until sometime in mid-March 1979 that Goldsmith and Greenstone, who had occasionally discussed the Procanik case with each other, finally met with Naishuler to decide whether or not to undertake the representation. According to Goldsmith's answers to interrogatories and his trial testimony, both *139 entirely undisputed, Herbert Greenstone, in addition to his trial expertise, was also the firm's primary appellate practitioner, Goldsmith being then relatively uninitiated in that area of practice. Greenstone, based upon his consideration of all of the accumulated materials, factual, medical and legal, was disinclined to accept the representation, understanding that because of Gleitman it would, at best, involve a dismissal of the complaint at the trial level at some stage or other; a losing appeal to the Appellate Division, which would also be bound by Gleitman; an effort to solicit the interest of the Supreme Court sufficiently to induce its grant of a petition for certification; the prosecution of the appeal in the Supreme Court if certification were granted; and then finally, years down the road and after, presumably, substantial financing by the firm,[2] the opportunity to prepare the case for trial by way of the extensive discovery typical of the "heavy" medical malpractice case and the ensuing opportunity to try it before a jury with all the risks and difficulties characteristic of serious malpractice litigation. It was clearly a project fraught with obstacles and uncertainties at every stage, and Greenstone was not interested in pursuing it.
It was Goldsmith's trial testimony that while the final decision not to take the case was Greenstone's, he, Goldsmith, concurred with it. In any event, it is not disputed that he acceded to it and communicated that decision to Sherman by letter dated April 26, 1979, which read in full as follows:

*140 Dear Harold:
We have finally come to a decision as to what to do with the Procanik case, after a great deal of discussion here in the office because of the problems presented by the case. Let me outline those problems to you as this forms the basis of our turning down this case.
The Procanik case basically falls into the area of a woman who had measles which was not definitively diagnosed, and, at approximately the same time was diagnosed as being pregnant. No steps were taken at that time. We are aware that Mrs. Procanik indicated that had she known of the potential problem, she would have undergone an abortion. We sent out the questions in the form of a possible malpractice case to an obstetrician/gynecologist, who felt that it was an extremely difficult position to put an obstetrician/gynecologist in. We did, however, decide not to leave it there and went ahead and reviewed the following:
1) Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967). As you are probably aware, this case prohibits the kind of action that would have to be brought herein. In other words, that type of action would be either a wrongful birth or an action for the purpose of trying to obtain damages for children who were born, and who would otherwise not have been born.
2) In January, 1979 two cases came down, reported as Nos. 559 and 560 of the Court of Appeals, New York entitled, Becker v. Schwartz and Park v. Chessin. These actions both are similar to Gleitman v. Cosgrove, and in effect, in New York, render a different opinion. It is possible that Gleitman could be reversed and it is further possible that the New Jersey courts could follow Becker v. Schwartz and Park v. Chessin. These cases do allow a person to sue under the circumstances of Procanik, and would allow the possibility of damages for life. It would mean, however, in Procanik, that the case would have to be started, face a dismissal at this level, and then obviously be appealed to the Supreme Court in the hopes of obtaining a reversal of Gleitman v. Cosgrove.

Considering the fact that the expert is somewhat weak on the case and considering the fact that it would have to be taken to the Supreme Court in order to obtain a reversal before a valid case could be brought, we have decided not to proceed. The law is dead against us in the State and the reversal would be necessary.

I am returning herewith all the hospital records that you were kind enough to send us. I will, if you like, send you a copy of the report of the expert. We have checked out every avenue and I think in all probability Mrs. Procanik did have measles, did become pregnant while she had the measles, and was not so informed. But because of the many and sundry other problems, we would not proceed.
Will you please be good enough to inform the Procaniks.
 Cordially,
 /s/ Lee
 LEE S. GOLDSMITH
*141 Sherman thereafter met with his clients, the Procaniks, and explained to them his understanding of Goldsmith's letter, advising them that their chance of success was "50/50." He also told them that while he could not represent them on a contingent fee basis, he would consider undertaking the action on an hourly rate, a proposal they declined. And finally, in order to avoid any misunderstanding he wrote them this "sign-off" letter:
Dear Mr. & Mrs. Procanik:
This will confirm that we have had a personal meeting to discuss the letter which I received from Mr. Lee Goldsmith, to whom I had referred the possible mal-practice claims, along with the materials and records collected up to this point.
The sad truth is that while the probabilities are that the facts you relate are true, that under the law of New Jersey as it presently stands, the case would not survive a dismissal at the trial level. For your information, Mr. Goldsmith is not interested in handling the matter, and his judgment is one on which I would certainly rely.
Accordingly, I have returned the materials to you with the caution that you are free to consult another attorney, who after all, might feel differently about the case. You are also advised that, while the infant's claim survives until two years from attaining his 18th birthday, it is advisable to bring these cases within two years after the parents know or should have known that there was a possible mal-practice claim, because the parents' claims for loss of services and medical expenses may be barred within two years, even though the infant's claim for injury might survive, as previously stated. It is also true that witnesses become less available, including doctors, and the same applies to records and other necessary documents.
I would, therefore, suggest that if you want to pursue this further, you contact another attorney immediately. I will provide any such attorney with a copy of Mr. Goldsmith's letter, should that request be made.
You will recall that you advanced us $200.00 towards costs, which were as follows:

Rahway Hospital Records: $ 54.00
Presbyterian Hospital Records: 48.00
Children's Hospital Records: 18.00
 _______
Total: $120.00

Accordingly, enclosed find our check for $80.00.
 Very truly yours,
 HAROLD A. SHERMAN
*142 That was the last communication of any of the attorneys with plaintiffs, and plaintiffs did not then seek to retain other counsel.
On June 26, 1979 the Supreme Court filed its opinion in Berman v. Allan, 80 N.J. 421 (1979). Berman adhered to that portion of the Gleitman decision which had rejected the viability of a child's cause of action for wrongful life. It overruled, however, the Gleitman rejection of the parents' cause of action for wrongful birth. In recognizing such a cause of action, however, it limited damages to the parents' emotional suffering, declining to permit recovery of the "medical and other expenses that will be incurred in order to properly raise, educate and supervise the child." Id. 80 N.J. at 432.[3]
About eighteen months following the declination of their case by Sherman, the Procaniks, on the advice of a friend, consulted with their present counsel, who filed a complaint on their behalf in April 1981. The complaint alleged a wrongful life complaint against the obstetricians on behalf of the child, a wrongful birth complaint against the obstetricians on behalf of the parents, and a legal malpractice complaint on behalf of the parents against Goldsmith, the Greenstone firm, and Sherman. The gravamen of the legal malpractice count, as it evolved, was that defendant attorneys, by improperly discouraging the Procaniks from commencing a timely action against the obstetricians, caused them to miss the statute of limitations on their wrongful birth claim against them.
More than six years elapsed between the filing of that complaint and the ultimate trial of this cause. The relevant procedural events which took place during that period began with a motion by the defendant obstetricians for dismissal of the infant's claim against them on the ground that it was *143 precluded by Berman and for dismissal of the parents' claim against them on the ground that it was precluded by the statute of limitations. The motion was granted by an order certifying it as final pursuant to R. 4:42-2.[4] Plaintiffs, having virtually conceded on the argument of the motion that the action had been commenced more than two years after their discovery of the physicians' negligence, appealed to this court only from that portion of the order dismissing the infant's wrongful birth claim.[5] We affirmed in an unreported opinion in which we deemed ourselves bound by Berman, and the Supreme Court granted certification. In its decision, Procanik by Procanik v. Cillo, 97 N.J. 339 (1984), rendered on August 1, 1984, the Court noted that in Schroeder v. Perkel, 87 N.J. 53 (1981), decided two years after Berman, it had extended the scope of damages recoverable in the parents' wrongful birth claim to include expenses for the care of the child directly attributable to his disabled condition. Further noting that these damages were not obtainable by the Procaniks in this case by reason of the *144 loss of their cause of action on account of the running of the statute of limitations, 97 N.J. at 344, the Court then addressed the question of whether those damages were recoverable by the child himself. The Court concluded that it would recognize a wrongful life cause of action for the sole purpose of permitting the child to seek those damages, provided, however, that they were recoverable only once, either in the child's wrongful life action or the parents' wrongful birth action. 97 N.J. at 351-354. The matter was then remanded for trial of the child's wrongful life cause of action against the obstetricians, limited to recovery of the expenses of care and treatment required by the rubella syndrome, and for trial of the parents' malpractice action against the defendant attorneys for the emotional distress damages they could have sought against the obstetricians but for the bar of the statute of limitations.
Following the remand, the defendant attorneys moved for summary judgment dismissing the malpractice count. The trial judge granted Sherman's motion but denied the motion of Goldsmith and Greenstone. His reasons were set forth in a reported opinion, Procanik v. Cillo, 206 N.J. Super. 270 (Law Div. 1985), which set the stage for the ultimate trial against the remaining attorney defendants. Thereafter, discovery was finally conducted and the matter was tried in 1986 before the same judge who decided the summary judgment motions. Trial was bifurcated, the infant's wrongful life claim against the obstetricians proceeding first and resulting in a substantial verdict for "special expense" damages in his favor. The legal malpractice count against Goldsmith and Greenstone was tried immediately thereafter but by a different jury. The trial judge, over plaintiffs' objection, instructed the jury on the issue of whether their negligence contributed to the missing of the statute of limitations, and the jury returned a liability verdict finding them to have been 15 percent at fault and the attorney-defendants 85 percent at fault. It also returned a substantial *145 verdict in their favor to compensate them for the loss of their medical malpractice action, a verdict then reduced by the judge to reflect their degree of negligence.
There is no appeal from the order dismissing the complaint as to Sherman. Defendants Goldsmith and Greenstone appeal from the denial of their summary judgment motion as well as from the judgment entered after trial on the jury verdict. Plaintiffs cross-appeal, complaining of the trial court's submission to the jury of the issue of plaintiffs' negligence, its denial of their motion to assess against defendant attorneys prejudgment interest on a portion of the judgment recovered against the physicians, and its ruling barring evidence of an attorney's duty to read the New Jersey Law Journal in full. As noted in note 1, supra, we deem the last of these issues as waived, and we do not address the remaining two issues because of our disposition of defendants' appeal in their favor.
In addressing the issues which are properly before us, it is first necessary for us to make clear what this appeal is not about. On the summary judgment motion the trial judge had held, among his other rulings, that neither Goldsmith nor Sherman had a duty subsequent to Sherman's "sign-off" letter to the Procaniks to advise them that the law had in fact changed. He also ruled that Goldsmith was barred from raising the contention that the complaint against the obstetricians had been timely filed. Addressing these matters in reverse order, we need not consider the law of the case ruling since we conclude that these defendants were not negligent. We do, however, note our reservations respecting the trial judge's ruling. See note 5, supra. We also do not consider the post-termination issue because it has not been raised on appeal.
With respect to the trial judge's conclusion on the summary judgment motion that an attorney-client relationship existed between Goldsmith and plaintiffs, we point out first that that ruling was, insofar as we are able to determine, based on a fact which later turned out to be incorrect. The trial court's *146 factual recitation noted that Sherman had engaged Goldsmith to give his opinion and advice as to the Procaniks' prospective cause. By the time of trial it appeared that that characterization was not accurate. Sherman had not submitted the matter to Goldsmith for a specialist's opinion but had rather asked Goldsmith if he would be interested in accepting the representation. The relational posture was therefore not that of an undertaking to render advice by a "specialist" attorney but merely his declination to accept a proffered representation. It is clear that an attorney must affirmatively accept a professional undertaking before the attorney-client relationship can attach, whether his acceptance be by speech, writing, or inferred from conduct. In re Palmieri, 76 N.J. 51, 58-59 (1978). This case is about an affirmative refusal of a professional undertaking, not its acceptance. There was thus no attorney-client relationship between Goldsmith and plaintiffs.
We nevertheless do not intend to suggest that threshold communications between attorney and prospective client do not impose certain obligations upon the attorney. But it is only the nature of the attorney's obligation in that threshold context, an obligation we address hereafter, which we must consider, not the whole panoply of fiduciary responsibilities and duties which come into play when an attorney-client relationship is formed. Thus, the sole dispositive issue as we perceive it is whether, based on the undisputed facts and plaintiffs' proofs at trial, plaintiffs established a prima facie case of attorney negligence against Goldsmith in that context.
That issue is narrowly focused. First, plaintiff concedes that the Greenstone firm committed no act of independent or separate attorney negligence. Its liability is predicated exclusively on principles of agency and respondeat superior. Second, plaintiffs concede that Goldsmith was not guilty of any intentional conduct against them but only of negligent conduct. Third, plaintiffs concede that in declining to take the case, Goldsmith had no obligation to state any reason at all for his decision. What this case is consequently about is plaintiffs' *147 theory, accepted by the trial judge both on the summary judgment motion and at trial, that if an attorney, and particularly a specialist, undertakes to give any reason at all for declining the case, he must give his full, complete and informed judgment. Plaintiffs assert that Goldsmith failed to do so.
The entire factual predicate on which plaintiffs construct their theory of Goldsmith's professional negligence is based on two alleged flaws in his letter of April 26, 1979 to Sherman which we have quoted in full. The first flaw was Goldsmith's failure to iterate in his letter to Sherman the statement he made in his January 29, 1979 memorandum to Greenstone respecting Gleitman, namely, that "I think the time is right, and I think we have a good shot at reversal." Their point is that Goldsmith thereby misled them respecting the strength of their case on appeal. The second is that Goldsmith mischaracterized Dr. Iffy, the proposed forensic expert, as "somewhat weak on the case," whereas, they claim, his report was strong. We reject both of these theses.
While we agree with the proposition that an attorney, in declining a representation, need give no reason at all, we disagree with the notion that if he gives any reason, it must fully explain his entire mental processes. In our view, if an attorney, including a specialist, voluntarily undertakes to give any reason for declining a case, whatever he does say must be professionally reasonable in the circumstances. We are also persuaded that there is not a scintilla of proof in this case that Goldsmith failed to comply with that standard.
We consider first the reason given by Goldsmith to Sherman respecting the state of the law on wrongful birth and wrongful life. Plaintiffs concede that Goldsmith's letter to Sherman was entirely accurate. They acknowledge, moreover, that the letter not only correctly stated the then settled law in New Jersey, but also explained that the law was evolving elsewhere and hence that "it is possible that Gleitman could be reversed and it is further possible that the New Jersey courts *148 could follow" the recent New York decision. And, they acknowledge, the letter correctly outlined the appellate procedure which would have to be prosecuted "in the hopes of obtaining a reversal of Gleitman v. Cosgrove." They complain only that Goldsmith did not say to Sherman, as he had to Greenstone, that the chances for reversal were good and the time was right for a change.
We regard the letter in this respect to be entirely reasonable and adequate as a matter of law. We wholly disagree with the trial judge's conclusion that Goldsmith was obliged to convey any private thoughts he might have had about the prospect of the success of an appeal seeking an overruling of the clearly stated decisional law.[6] It was certainly enough that he communicated the information respecting the recent change in New York and the possibility of an overruling of Gleitman engendered thereby. Obviously, predicting the future course of the *149 evolution of legal principle is at best a risky business. Predicting that the state's highest court will, in a particular case, overrule a legal doctrine theretofore expressly embraced by it is even riskier, and this is particularly true where, as here, the issues involved are inordinately complex, involving broad and profound moral, ethical and public policy issues as well as jurisprudential ones and as to which there is a wide disparity of view among the jurisdictions. See, e.g., cases collected in Annotation, "Tort Liability for Wrongfully Causing One to Be Born," 83 A.L.R.3d 15 (1978), and supplements thereto. Consequently, a lawyer who correctly explains the existing decisional law of the jurisdiction, the recent disparate view of a sister jurisdiction, the consequent fact of potential change of decisional law on appeal, and the procedures for obtaining change has fulfilled any obligation he may have to explain his state-of-the-law reasons for declining the case. It is not a professional dereliction for him to withhold his gratuitous prediction of the prospect of success of an appeal which would be taken to obtain a change in the law.
Our conclusion is based on what we believe to be established principle governing an attorney's communication respecting the state of the law whether to a client or a prospective client. First, where, as here, there is no attorney-client relationship, an attorney is free to decline the representation without stating any reason at all. He is not, however, without obligation with respect to a reason he does undertake to give. Justice Vanderbilt expressed the nature of that obligation in In re Gavel, 22 N.J. 248, 265 (1956), this way:
In addition to the duties and obligations of an attorney to his client, he is responsible to the courts, to the profession of the law, and to the public, * * *. He is bound even in the absence of the attorney-client relation to a more rigid standard of conduct than required of laymen. To the public he is a lawyer whether he acts in a representative capacity or otherwise.
Justice Vanderbilt thus concluded that the attorney's fiduciary obligation extends to "persons who, although not strictly clients, he has or should have reason to believe rely on him." Ibid. See also Matter of Schwartz, 99 N.J. 510, 517 (1985); In *150 re Palmieri, supra, 76 N.J. at 59; In re Hurd, 69 N.J. 316 (1976). We have no doubt that when an attorney, and particularly one specializing in a specific area of the law, declines a representation because of the state of the law which he undertakes to express, he knows or should know that the prospective client will depend on the reliability of that expression. Nor is there any doubt here that Goldsmith knew that plaintiffs would so rely on his letter to Sherman. Indeed he asked Sherman to "please be good enough to inform the Procaniks."
We also regard as well settled the scope and nature of the duty of a lawyer who does undertake to state the law to a client or a prospective client. If the law is settled, he is expected to know what it is and to state it accurately. See generally Mallen and Levit, Legal Malpractice (2d ed. 1981) at pp. 282-284. If the law is unsettled, debatable or doubtful, he is not required to be correct, usually determinable only by hindsight, but only to exercise an informed judgment based on a reasoned professional evaluation. See Davis v. Damrell, 119 Cal. App.3d 883, 174 Cal. Rptr. 257, 259 (Ct.App. 1981). As explained by Mallen and Levit, supra at 288,
Implicit in the immunity afforded attorneys for their exercise of judgment on debatable or unsettled points of law is the recognition that an attorney is not required to anticipate correctly the view the courts may ultimately embrace. An attorney is not negligent because he advocates a different view of the law than that ultimately adopted.
Nor is an attorney obliged to anticipate a change in settled law. See Hodges v. Carter, 239 N.C. 517, 80 S.E.2d 144 (1954); Patterson v. Powell, 31 Misc. 250, 64 N.Y.S. 43 (Sup.Ct. 1900), aff'd 56 App.Div. 624, 68 N.Y.S. 1145 (1900); Ruchti v. Goldfein, 113 Cal. App.3d 928, 170 Cal. Rptr. 375 (Ct.App. 1980). And if, as here, the attorney has a degree of expertise in a complex and volatile area of the law which leads him to believe, because of developments elsewhere, that change in settled law is possible, it is surely enough for him to point out that that is so and why  just as Goldsmith did here. That explanation need not and perhaps ought not be accompanied by a prediction of the likelihood that he can effect that change in the decisional *151 law in that very case. Surely any experienced practitioner must understand the uncertainty of that prospect even if he believes that the time for seeking change is right and the chances reasonably good. And it is that very uncertainty which ultimately precludes imposition of liability based on his withholding of such a prediction. We concur with the observation of Mallen and Levit that
The status of a legal proposition varies with time. That which seems indisputably correct today may be deemed clearly erroneous tomorrow. Conversely, that which now appears erroneous may in the future be revealed as correct. Lawyers should not be penalized for either following an erroneous view which the ordinary lawyer perceives to be correct or for urging the correct view which the ordinary lawyer considers to be erroneous. Id., 1984 Supplement at 39.
Nor a fortiori can a lawyer be penalized when he not only accurately states the existing rule of law but also points out a reasoned basis supporting the possibility of its change. There was, in sum, nothing actionable in Goldsmith's legal explanation to Sherman.
The second factual predicate of plaintiffs' action was Goldsmith's characterization of Dr. Iffy's expert opinion respecting the obstetrician's medical malpractice as "somewhat weak." Plaintiffs contend that it was not weak at all but highly supportive of their medical malpractice claim. In the light of plaintiffs' stipulation that Goldsmith did not intentionally misrepresent his evaluation of Dr. Iffy's report,[7] the legal issue, as we view it, is simply whether the "somewhat weak" characterization was a reasonable one to have been made by a lawyer skilled in medical malpractice litigation. We note that this is, in effect, the same standard which would apply in the *152 case of an attorney-client relationship, wherein the attorney, although not a guarantor against errors in judgment, is nevertheless required to exercise "the knowledge, skill and ability ordinarily possessed and employed by members of the legal profession similarly situated." Gautam v. DeLuca, 215 N.J. Super. 388, 396 (App.Div. 1987). And see St. Pius X House of Retreats v. Camden Dioc., 88 N.J. 571, 588 (1982); Passanante v. Yormark, 138 N.J. Super. 233, 238 (App.Div. 1975), certif. den. 70 N.J. 144 (1976).
The first question, of course, is what "somewhat weak" means. That question raises the conundrum of the glass that is half full and therefore also half empty. Thus "somewhat weak," in our view, may also connote "somewhat strong." We are, however, persuaded that at the very most all that that phrase could be reasonably understood to have meant was that the report of Dr. Iffy was not unequivocal respecting the strength of plaintiffs' claim of medical malpractice liability. In short, he saw some problems. So viewed, we are also persuaded that the characterization was, on the face of the report itself, not unreasonable. Dr. Iffy, the forensic expert and versed in medical-legal matters, did not expressly state that the obstetrician's conduct was contrary to the accepted community standard of medical practice. He noted the failure of the obstetrician's records to include critical conversations between patient and physician which Mrs. Procanik had related to Sherman, thereby leaving the door open to a significant credibility issue at a potential trial. He pointed out, with respect to Mrs. Procanik's blood test ordered by defendant Dr. Cillo, that "the titer of rubella antibodies was not very high and it was compatible, therefore, with a rubella infection before, rather than during, gestation." And he further expressed the view that even after further investigation of the nature of the illness plaintiff had had early in her pregnancy, it was possible that it "could not have been resolved conclusively." Despite these problems, Dr. Iffy did conclude that in that eventuality

*153 the decision with regard to the fate of the gestation would have rested upon the detailed analysis of all relevant facts and would have incorporated the opinion of experts, including a specialist of infectious diseases. In that case the patient herself would have been involved in the decision making with full awareness of the options and their respective implications. I regret to conclude that the obstetrician's failure of exploring the background of the relevant data deprived this patient of this opportunity.
Based on the foregoing, we are satisfied that a medical mal-practice expert aware of the context and difficulties of proving a plaintiff's medical malpractice case could, beyond any factual dispute, reasonably have characterized the report as Goldsmith did.
Even if we were to assume that Goldsmith's characterization of the Iffy report raised a potential factual question triable by a jury, we are satisfied that plaintiff failed to adduce proof that it was unreasonable. Plaintiffs' legal expert, not a medical mal-practice expert, did not testify that the characterization, as he understood its meaning, was unreasonable but only that in his opinion Dr. Iffy's report was strong. Obviously, the fact that his opinion was different from Goldsmith's does not constitute proof that Goldsmith's opinion, even if erroneous, was unreasonable.[8] We also regard as irrelevant the testimony of plaintiffs' medical expert, also a perinatologist, who testified as to his understanding and evaluation of the Iffy report. The issue *154 was not what the report meant to another physician but how it could be reasonably interpreted by a lawyer, and that was not an issue as to which a physician was competent to express an opinion.
In conclusion, we have substantial doubt as to the propriety of the denial of these defendants' motion for summary judgment. Beyond that, we are persuaded that the trial proofs did not raise a jury question as to Goldsmith's breach of any duty he owed the Procaniks. We recognize that this is a tragic case and that the Procanik family has suffered anguish and will continue to suffer in the future. But we nevertheless fail to perceive any professional error in Goldsmith's conduct which could make him or his employers answerable to the Procaniks in damages. We do not, of course, intend to relieve any attorney from the consequences of his breach of duty or professional conduct which deviates from the required standards of reasonable skill and judgment. By the same token, we cannot hold attorneys to a standard of clairvoyance or make them guarantors of success in every case.
Reversed and remanded for entry of judgment dismissing the complaint as to defendants Goldsmith and Greenstone, Greenstone and Naishuler.
NOTES
[1] Goldsmith was, however, unaware that on September 5, 1978 the New Jersey Supreme Court granted plaintiffs' petition for certification in Berman v. Allan, 80 N.J. 421 (1979), certif. granted 78 N.J. 325 (1978). A notice of the grant of certification appeared in the New Jersey Law Journal on December 28, 1978 on an inside page continuation of the "Appeals Pending in the Supreme Court" column. See 102 N.J.L.J. Index Pages 569, 576 (1978). The statement of the issue encompassed by the certification read as follows: "Are infant afflicted with Down's Syndrome and her parents entitled to damages as a matter of law for a `wrongful birth'?"

The trial court, in its published opinion denying these defendants' motion for summary judgment, held that their failure to have noticed or otherwise become aware of the Law Journal report of the Berman certification did not constitute actionable negligence or a breach of professional duty on their part. See Procanik v. Cillo, 206 N.J. Super. 270, 283-285 (Law.Div. 1985). Although plaintiffs' notice of cross-appeal includes among the challenged rulings that of the trial judge "barring evidence of an attorney's duty to read the New Jersey Law Journal," that issue was not briefed or otherwise addressed on this appeal, and we consequently deem it waived. See Miller v. Reis, 189 N.J. Super. 437, 441 (App. Div. 1983); Cannon v. Krakowitch, 54 N.J. Super. 93, 96 (App.Div. 1959). We, therefore, do not consider it and consequently deal with the issues presented to us as if that Law Journal report had never appeared.
[2] Goldsmith's testimony respecting his arrangements with the Greenstone firm during the time of his "of counsel" relationship raises the ineluctable inference that while he would have shared equally with the firm in any contingent fee earned on matters he brought into the office, the substantial burden of "financing" the litigation during its protracted pendency would have fallen primarily on the Greenstone partners. Moreover, it would have been Herbert Greenstone who would have been directly responsible for prosecuting the various required appellate proceedings. These disparate burdens and benefits may well have accounted for Goldsmith's original enthusiasm for the case and Greenstone's disinclination.
[3] This damages limitation was overruled by Schroeder v. Perkel, 87 N.J. 53 (1981), which permitted recovery of special medical and other care expenses in a wrongful birth action.
[4] The question as to whether the certification was proper under that rule is not before us, and the time is long since past for considering it. We note, however, that R. 4:42-2 precludes certification in circumstances such as these, and had the matter continued without the intervening appeal, it might well have been more expeditiously concluded.
[5] As will appear hereafter, one of the issues still remaining and raised before us on appeal is the defendants' attorney claim that they were never accorded the opportunity to argue, contrary to the physicians' position, that the statute of limitations had not run against the physicians when the complaint was filed. Their substantive contention is that plaintiffs were not chargeable with knowledge of their cause of action until Berman was decided, an event which predated filing of their complaint by less than two years. See Tevis v. Tevis, 79 N.J. 422 (1979). We need not address this issue or the problem of whether the law of the case doctrine was appropriately invoked against them to bar their raising of this issue since we have concluded that they were not in any event negligent. We express, however, grave doubts that the law of the case doctrine can be applied to foreclose an issue never substantively addressed by the party against whom it was decided in circumstances such as these where an adverse party's stipulation determines which of two potentially liable defendants will ultimately be required to defend.
[6] The trial judge's thinking is most clearly expressed in this portion of his instructions to the jury:

Now, in this situation I further instruct you that you must assume that an attorney-client relationship existed between Mr. Goldsmith and the Procaniks through Harold Sherman. It is undisputed that the Gleitman v. Cosgrove decision, which you've heard many times in this case, was the settled law at the time of the letter from Goldsmith to Greenstone dated April 26th, 1979. This Court holds that specialists have the right to decline a case for any reason or for no reason and that in declining a case, a specialist does not have to give any reason.
However, if the specialist chooses to give a reason, you are instructed that in such an instance a lawyer, such as a specialist, has a duty to disclose to his clients clearly and unmistakably a complete opinion, giving his full informed judgment.
The question that you have to decide is whether Mr. Goldsmith's letter of April 26th, 1979, reflected his complete judgment. Therefore, you must decide whether Mr. Goldsmith negligently misrepresented either the strength of the Iffy medical report or the chances of overruling Gleitman, you recall that's the name of a case, or both. If you find that the letter was a negligent misrepresentation of either or both as to what Lee Goldsmith believed, then you must find that Mr. Goldsmith was negligent.
On the other hand, if you find that the letter was his complete informed judgment, then you must find in favor of the defendant, Mr. Goldsmith.
[7] At trial plaintiffs suggested that Goldsmith may have "negligently" misrepresented his true opinion of Dr. Iffy's letter because, in the interests of preserving a forwarding attorney relationship with Sherman, he would not have wanted Sherman to think that he, Goldsmith, would turn down a good case. Our review of the record persuades us that this theory was without the slightest proof by way of direct evidence or legitimate inference. It was pure speculation.
[8] Although we have concluded that the reasonableness of Goldsmith's characterization of the Iffy report did not present a jury question, we nevertheless point out what we regard to have been a prejudicial error committed by the trial judge in excluding evidence proffered by Goldsmith on that subject. According to the proffer he had sent another matter to Dr. Iffy for evaluation and had received that report some three weeks after his receipt of the Procanik report. The other report, included in the appendix on appeal, unlike the Procanik report, asserts unequivocally that "[t]here have been several significant deviations from established obstetric standards of practice in the course of the management of this case which can be established despite the inadequate documentation from the records." The purpose of the proffer was, of course, to enable the jury to compare the two reports in terms of their disparate medical-legal conclusions in order to support Goldsmith's claim that he reasonably regarded Dr. Iffy's Procanik report as "somewhat weak." We also note that Goldsmith's characterization was supported by two expert witnesses, both attorneys experienced in the conduct of medical malpractice litigation.