233 N.J. Super. 137 (1989)
558 A.2d 65
AMERICAN HOME ASSURANCE COMPANY, PLAINTIFF-APPELLANT,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, DEFENDANT-RESPONDENT, AND GREENSTONE, GREENSTONE & NAISCHULER, P.C.; HAROLD A. SHERMAN; PETER PROCANIK, AN INFANT, BY HIS GUARDIAN AD LITEM, ROSEMARIE PROCANIK; ROSEMARIE PROCANIK AND MICHAEL PROCANIK; LEE S. GOLDSMITH; AND GREENSTONE, GREENSTONE, NAISCHULER AND GOLDSMITH, P.A., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 1989.
Decided May 17, 1989.
*138 Before Judges PRESSLER, O'BRIEN and STERN.
John C. Kennedy argued the cause for appellant (O'Donnell, Kennedy, Vespole & Piechta, attorneys, John C. Kennedy, of counsel and on the brief).
Richard D. Catenacci argued the cause for respondent (Connell, Foley & Geiser, attorneys, Richard D. Catenacci, of counsel, Richard D. Catenacci and Janet Zaorski Kalapos, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is a dispute between two professional liability carriers over their respective obligations to provide a defense to the same insured covered by a policy issued by each. The trial judge dismissed the complaint of American Home Assurance Company (American Home), which sought contribution to its defense costs from defendant St. Paul Fire & Marine Insurance *139 Company (St. Paul). It was his conclusion that in the circumstances here, American Home provided primary coverage for their mutual insured and St. Paul provided only excess coverage. While we affirm the judgment from which American Home appeals, we do so on different grounds.
The critical underlying facts are not in dispute and arise out of a legal malpractice action commenced in April 1981 by the Procanik family against an attorney, Lee Goldsmith, and, on a respondeat superior theory, the New Jersey firm with which he was associated when he allegedly committed the act of malpractice. The facts of the malpractice action are detailed in our opinion in Procanik By Procanik v. Cillo, 226 N.J. Super. 132 (App. Div. 1988), certif. den. 113 N.J. 357 (1988). Suffice it to say that we there reversed the substantial verdict which had been rendered against Goldsmith and the Greenstone firm in the Procaniks' favor, holding that based on the facts of record, Goldsmith's conduct of which the Procaniks complained did not constitute professional negligence. The Supreme Court's denial of the Procaniks' petition for certification finally resolved the issue in the attorneys' favor after more than seven years of litigation against them. Hence, there was in the end no question of indemnification for their conduct by their malpractice carriers but only the question of the carriers' respective responsibility for the not insubstantial defense costs which had been incurred during the course of that protracted and difficult litigation. That is the only issue here involved.
When the malpractice was alleged to have been committed, Goldsmith was practicing law both in his own name in New York and with the Greenstone firm in New Jersey. At the time the Procanik claim was made, Goldsmith had, on his own behalf, a malpractice policy written by plaintiff, American Home, and there is no question that the coverage was in full force and effect and entitled Goldsmith to both a defense and indemnity in respect of that claim. At the same time, the Greenstone firm was covered for malpractice by St. Paul by a policy expressly extending coverage to each of the attorneys *140 listed therein, including Goldsmith. When Goldsmith and the Greenstone firm were served with process in the Procanik action, Goldsmith sent a copy of the complaint to each of the two carriers by letters written on the letterhead of the Greenstone firm and signed by him in the name of the firm. The only variation in the text of the correspondence was that in the letter to American Home, Goldsmith asked for a defense on "my behalf" and in the letter to St. Paul, he asked for a defense on "our behalf."
Each of the carriers purported to comply with its contractual obligations. For the next seven years, St. Paul represented only the Greenstone firm. It chose and paid its own attorneys and remained in full control of the litigation in respect of that defendant. American Home did the same, and in the same manner, for Goldsmith. It does not appear from this record that at any time prior to December 1985, some four-and-a-half years after the commencement of the action, either carrier had suggested in any way that the St. Paul defense of the Greenstone firm and the American Home defense of Goldsmith was not an arrangement undertaken by the two carriers with their mutual knowledge and tacit approval. In December 1985 a letter was written to Goldsmith by a claims examiner of American Home, who advised him that although he was being defended by American Home and the Greenstone firm was being represented by St. Paul, he, Goldsmith, was also entitled to defense and indemnity under the St. Paul policy. The letter consequently advised him that
to protect your interest, please contact Greenstone, Greenstone and Naischuler and demand that they join in your defense and in any indemnity obligation through their coverage with St. Paul.
It does not, however, appear that Goldsmith followed that suggestion. Nor does it appear that American Home itself had ever made demand on St. Paul for St. Paul's participation in Goldsmith's, as opposed to the Greenstone firm's, defense prior to the events preceding the institution of this action.
American Home filed its complaint against St. Paul in December 1986 seeking, by way of declarative relief, a judgment *141 holding St. Paul liable for Goldsmith's defense and for any indemnity which might be required. Its theories were, in the alternative, that St. Paul had wrongfully refused to defend Goldsmith and that St. Paul's coverage was primary and American Home's excess. It also sought punitive damages from St. Paul. The procedural course followed by this litigation during the next months is not explicated by the record before us. It does, however, appear that in the spring of 1988 the parties moved and cross-moved for partial summary judgment. The motions were orally argued on June 17, 1988, and the trial judge then concluded that American Home's coverage was primary in respect of Goldsmith and St. Paul's excess. A conforming order so declaring was entered. On June 30, 1988, we filed our opinion in Procanik, supra, absolving Goldsmith and, consequently, the Greenstone firm as well since the claim against it was based only on vicarious liability flowing from Goldsmith's asserted negligence. Thus, it was then clear that neither company would be called upon to indemnify but only to pay defense costs, each carrier having by then paid its own. Accordingly, an order dismissing American Home's complaint was then entered.
As we have noted, we disagree with the trial judge's view that American Home's coverage was primary and St. Paul's excess. In so concluding, the trial judge relied on Com'l U. Ins. v. Chubb Group of Ins., 101 N.J. 24 (1985), rev'g 194 N.J. Super. 69, 80 (App.Div. 1984), on Judge Brody's dissent. In that case the dispute was, analogously, between the malpractice carrier of a physician and the malpractice carrier for the professional corporation by which the physician was employed and of which he was a shareholder. Judge Brody's view that the physician's own coverage was primary to the corporation's coverage rested upon two grounds. The first was the language of the corporation's policy which excepted coverage for an executive officer, director or shareholder "with respect to liability for his personal acts of a professional nature." 194 N.J. Super. *142 at 74. Judge Brody construed this language as mandating the subordination of any coverage that the corporate policy afforded to the physician for his own malpractice to the coverage of his "own" policy. The second and supporting reason for Judge Brody's view was that that exclusionary language in the corporation's policy comported with the principle that "[w]here one liability policy covers an employee for his own negligence and another covers his employer for the same negligence, the employee's policy must first be exhausted before the employer's carrier may be called upon to pay." 194 N.J. Super. at 82. And the rationale of this principle is the "common-law rule that a negligent employee must indemnify his employer whose liability is only vicarious." Ibid. Thus, Judge Brody concluded that
if Chubb [the corporate policy] had paid the injured party in response to the corporation's vicarious liability coverage, it would be entitled to indemnification from Commercial [the physician's own policy] for so much of the payment as exceeded the doctor's basic malpractice coverage under Chubb's individual policy. To avoid a "circuity of action," the Chubb policy covering the doctor individually for malpractice and Commercial's excess policy which expands his individual malpractice coverage must pay the injured party before the Chubb corporation policy is called upon to pay for the corporation's vicarious liability. [Id. at 82-83].
The question here is not the soundness of the dissenting view in Commercial Union. Not only do we agree with it but, more to the point, the Supreme Court adopted it. As we see it, however, Commercial Union is inapposite here. First, St. Paul's policy is completely devoid of any exclusionary language of import similar to the language of the Chubb policy which was the linchpin of the dissent. Nor does the common-law rule of employer indemnification apply here since there was, in the end, no liability and hence no negligence to indemnify against. Indeed, St. Paul itself concedes that Commercial Union does not apply here, and we agree.
St. Paul, rather, bases its resistance to American Home's contribution claims on equitable grounds and, we believe, correctly so. We note first that if the St. Paul and American Home policies are not layered in respect of Goldsmith, and we see nothing in the policies suggesting that they should be, then *143 both must be deemed to afford Goldsmith primary coverage. Ordinarily, that means that the two carriers would bear equal responsibility for payment of claim expenses. See, e.g., American Nurses Ass'n v. Passaic General Hospital, 98 N.J. 83 (1984). But that proposition, in our view, is the beginning, not the end, of the inquiry.
As we made clear in Rooney v. West Orange Tp., 200 N.J. Super. 201 (App.Div. 1985), an excess insurer who is required to defend because of the primary insurer's wrongful refusal to do so is entitled to reimbursement from it. As we understand American Home's position, it contends that this rule should apply in favor of a primary insurer who seeks contribution from another primary insurer who has failed voluntarily to contribute upon demand. Even if the legal principle so asserted here were sound, American Home would not be entitled to its benefit in the circumstances here.
The reimbursement rule explained in Rooney rests upon the essential predicate that the excess carrier who defends in place of the wrongfully refusing primary carrier is undertaking an obligation that is not, in the first instance, its responsibility. It does not, however, do so as a volunteer, a status which would preclude its reimbursement claim, but because of the requirements implicit in and flowing from its own covenant to defend. Thus, as we reasoned in Rooney, if, as is typical, the primary insurer has disclaimed and its disclaimer is ultimately sustained, there would in fact be no primary coverage, and the full responsibility would then fall on the excess carrier. Consequently, when the excess carrier defends upon a disclaimer by the primary carrier, "it will not be regarded as a volunteer because it has undertaken the defense by reason of its own contractual duty to defend and because the public interest is served by its undertaking of the defense." 200 N.J. Super. at 207.
The situation as between primary insurers of the same insured is entirely different. In that situation each of them has an equal obligation to defend. Thus, in undertaking that obligation *144 neither is performing a responsibility which is fundamentally the other's, and consequently, the equitable underpinning of the Rooney rule is not present. Moreover, in assuming the defense obligation, a primary insurer obtains the advantage of selecting attorneys of its choice, determining strategy, and otherwise controlling the litigation. When a primary carrier who has assumed that undertaking requests contribution from the other primary carrier, it is implicit that the defense will then become a collaborative effort between them since the other primary carrier surely has equal litigation control rights which it is entitled to exercise if it is called upon to pay for the defense. We thus assume that ordinarily when there are two primary carriers of a single insured who are known to each other, they will arrange between themselves on a voluntary basis the manner in which they will share the responsibilities, financial and strategic, for the defense. Consequently, if they are known to each other and make no demand on each other for contribution to the defense, it must be assumed that the one which has exclusively undertaken the defense has done so voluntarily and in order to secure the litigation advantages which exclusive control confers. In any event, as we made clear in Rooney, whatever contribution obligation would be imposed on the other primary insurer could not accrue until that insurer were requested to participate on some basis. 200 N.J. Super. at 207-208.
Here, as noted, the litigation was into its fifth year before American Home raised even the specter of St. Paul's obligation to participate in Goldsmith's defense. During all those years, American Home must surely have known that St. Paul was in the case as the Greenstone firm's carrier and that the claim against Greenstone was exclusively based on its vicarious liability for Goldsmith's negligence. We cannot conceive of the possibility that American Home, itself a malpractice carrier, did not know that St. Paul also covered Goldsmith directly or at least that it probably did. Yet, it made no inquiry, no demand, and no request directed towards obtaining St. Paul's participation *145 in Goldsmith's defense as well as Greenstone's. The inference is unavoidable that the arrangement by which these lawyer-defendants were being defended  that is, Goldsmith by American Home and Greenstone by St. Paul  was understood by the two carriers. By that arrangement, each maintained control of its portion of the litigation, and the defense as a whole obtained the advantage, as St. Paul puts it, of "two bites of the apple" at every turn  double discovery, double motions, double arguments, double briefs, double peremptory challenges, double summations  in short, double representation.
Not only was this arrangement completely fair to both insurers, it also necessarily implied that each insurer understood and tacitly agreed that it would itself pay for the defense it was providing. American Home's acquiescence in this arrangement, its failure for so many years to have suggested any discontent with it, and the litigation advantage of exclusive control it thereby obtained persuade us that, in the circumstances here, it acted as a volunteer in having exclusively assumed Goldsmith's defense for four-and-a-half years without a murmur of protest. It is for these reasons that we conclude it must exclusively bear the full cost of Goldsmith's defense.
Affirmed.