## IN THE MATTER OF FRANK A. PALMIERI,
## AN ATTORNEY-AT-LAW.

Argued February 22, 1977—Decided April 25, 1978.

*Mr. Frederick C. Vonhof* argued the cause for the Essex County Ethics Committee.

*Mr. Morris M. Schnitzer* argued the cause for respondent (*Messrs. Schnitzer and Schnitzer*, attorneys; *Mr. Morris M. Schnitzer* on the brief).

PER CURIAM. Some twenty-three years ago Justice Jacobs mused that society might be "better served if practicing at-

torneys were to remain full-time lawyers rather than become part-time businessmen." *In re Carlsen*, 17 *N. J.* 338, 346 (1955). Certainly respondent would have been better served had he considered that prescient observation, for he undoubtedly would thereby have avoided part of the entanglement with complainants which has resulted in unresolved civil litigation and in complaints to the New Jersey Bureau of Securities and the Essex County Prosecutor's office, as well as in these ethics proceedings. The present matter arose out of a presentment issued by the Essex County Ethics Committee. Respondent, Frank Palmieri, is now before this Court on an Order to Show Cause why he should not be disbarred or otherwise disciplined.

I

The presentment addresses two separate but, as will be seen, not entirely unrelated transactions. Complaints were filed with the Committee by Michael and Amil Frino, who asserted that during the time Palmieri was acting as their attorney in connection with the purchase of a supermarket business, Waybest Super Market, Inc., he borrowed large sums of money from them. They alleged further that in order to discharge this personal debt, respondent induced the complainants to enter into a stock purchase and voting trust agreement whereby they became stockholders in a hotel venture controlled by respondent. As a result of respondent's inducements the complainants invested "more than $180,000 the greater part of which has been lost." Complainants charged further that Palmieri represented them as sellers and at the same time represented the purchasers in the sale of their supermarket business, and that by reason of respondent's dual representation the Frinos were "damaged in an amount [estimated] at more than $250,000." Respondent, in his answer, denied any attorney-client relationship in the hotel transaction and in turn charged complainants, whom he characterized as "good and shrewd businessmen," with utiliz-

ing the ethics committee as the medium through which they would "recoup their investment in a totally legitimate business proposition." He further asserted that his dual representation in the supermarket deal was simply an accommodation to the clients after full disclosure.

The Committee rejected respondent's denial of any wrong doing. It concluded that an attorney-client relationship existed between complainants and respondent during the period in which the transactions involving the hotel occurred, and that respondent's conduct surrounding those transactions amounted to an abuse of the attorney-client relationship. An ethical transgression was found also in respondent's representation of both the buyers and sellers of Waybest Supermarket, the conclusion being that respondent's dual representation involved an improper conflict of interest.

We have carefully scrutinized the record and transcript of the Committee's hearing for the purpose of making a *de novo* assessment of respondent's conduct, *In re Logan,* 71 *N. J.* 583, 586 (1976). Based thereon we conclude that the proof, in both quantum and quality, of any professional transgression in the hotel transaction falls short of the applicable standard of "clear and convincing." See, *e. g., In re Gross,* 67 *N. J.* 419, 424 (1975). On the other hand a disciplinary infraction does emerge from the record with respect to respondent's participation in the supermarket controversy.

## II

What we have referred to as the "hotel transaction" actually involves a series of events taking place from about 1961 to 1973. It was in 1961 that the Frinos first began to spend their summer weekends at the Stockton Hotel in Sea Girt. In 1957 Palmieri, through a corporation controlled by him, had purchased the land, hotel building, and the liquor license for $400,000. His purpose was not to operate the hotel but rather to raze the structure and erect

a modern facility in its place. Because Palmieri was unable to secure a building permit from the municipality for this purpose, lengthy litigation ensued with the final resolution not forthcoming until this Court's decision in the matter, *Kramer v. Board of Adjustment, Sea Girt,* 45 N. J. 268 (1965). In the meantime, however, the expenses of maintaining the business and preserving the ultimate project continued.

Enter the Frinos. They had been clients of respondent in various matters since 1957. Commencing in December, 1961, they began, at Palmieri's request, to loan funds in consideration of demand notes bearing interest at 6% and 8%. The notes were executed either by respondent personally or by him and his secretary as officers of the corporation.[1] Complainants and respondent are in sharp disagreement as to the purpose for which these loans were made, the former contending that most of the money went to satisfy respondent's personal needs and expenses of running his law office, and the latter insisting that the funds were earmarked and used for the Stockton. Significantly, complainants' contention in this regard is partially undermined by the uncontradicted testimony of Palmieri as to his professional income, which was quite sufficient for maintaining himself and his family, and as to his borrowing capacity.

Respondent further takes the position that during the period 1961 through 1965, complainants, wearying of the long hours and stressful routine involved in operating their supermarket and eager to share in the business opportunity presented by Palmieri's vision of a year-round, four to five million dollar, four story, two hundred twenty-five room hotel on about seven acres of prime ocean front property,

---

[1]The Committee's presentment is inconsistent with respect to the total amount represented by these notes. Inasmuch as the pending civil litigation will focus directly on the sums involved, we concern ourselves with the total no further than to note that the aggregate amount outstanding at any one time appears to be between $31,500 and $42,500.

directed their attention on how the "back house" operation (purchasing and internal management) could profit from their considerable business experience and skills. According to respondent, by 1965 the Frinos were biding their time, awaiting the opportunity to seize some control of the enterprise which needed only the right financing to make the new hotel a reality. According to complainants they were nothing more than ordinary lenders, uninterested in gaining any foothold in Palmieri's business enterprise but understandably concerned with obtaining some security for their loans.

This, then, was the posture of the parties when, in September of 1965, just days before it was scheduled to be torn down, the Stockton burned to the ground. In November the Frinos purchased 17.5 shares of stock in the hotel. In April, 1966, Palmieri was hospitalized after suffering the first of three strokes. It was at this point or shortly thereafter (depending upon whose version is accepted) that the Frinos and Palmieri prepared to enter into the stock purchase and voting trust agreement which is central to the dispute between those parties. While the testimony cannot be reconciled (and the Committee made no specific finding) as to whether the Frinos took advantage of respondent while he was in a weakened and despondent condition in the hospital, or whether Palmieri, as part of his alleged legal representation of complainants, lured them into a venture fraught with unreasonable risk, the terms of the bargain are clear. Essentially the agreement provided that the Frinos would pay $91,590, made up of cash and the surrender of some $30,000 in notes previously executed by Palmieri as indicated heretofore, in consideration of Palmieri's turning over to the Frinos sufficient stock so as to make them equal holders with respondent (475.450 shares each in Palmieri and the Frino brothers). Thereupon the total of 950.90 shares of stock, or a clear majority of the 1650 outstanding, was to be placed in a voting trust, which required unit voting by the trustees. The funds paid by the Frinos for Pal-

mieri's stock were to be used by the respondent to keep the corporation afloat.

But these funds, and others loaned to the corporation by complainants, respondent, and other stockholders for the purpose of defraying taxes and debt service, could not begin to advance the enterprise towards construction of the new hotel in the absence of major new financing. This was not forthcoming. The hotel building permit expired in January, 1970. Attention then turned to the possibility of subdividing the hotel site into residential building lots, but sometime in 1971 a dispute arose between the Frinos and respondent arising out of litigation over the sale of complainants' supermarket business. The upshot of this was that the Frinos brought suit for $88,500 due them from Stockton Hotel, Inc., whereupon the corporation went into state court receivership, under which general creditors received dividends at the rate of 80%. Hence the demise of the hotel project.

It was on the basis of this evidence that the Committee concluded, as stated in its presentment, that "the attorney and client relationship between complainants and the respondent was abused by respondent in the creation and the continuation of the creditor and debtor relationship when respondent well knew complainants were without independent legal counsel or advice and had interests adverse to those of respondent." The presentment further recites that respondent, well knowing that the hotel "was in a precarious financial condition on June 10, 1966 when the contract and voting trust agreement were executed," nevertheless used the contract as a "device * * * to obliterate his personal liability on his notes by converting his indebtedness to complainants into a corporate obligation, and to obtain additional cash moneys from complainants upon proferring them shares of stock" in the hotel venture. Notwithstanding the fact that the transactions on which the asserted violations are based took place prior to September 13, 1971, the effective date of the Disciplinary Rules of the Code of Pro-

fessional Responsibility, the Committee charged respondent with violations of DR5–101(A) and DR5–104(A).[2] The canon of Professional Ethics in effect in 1966 which most closely parallels the cited Disciplinary Rules in Canon 6, reading as follows:

> It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts.

That canon would include within its sweep the conduct contemplated by the Disciplinary Rules relied on by the Committee, and a violation would arguably be present if in fact a lawyer-client relationship existed, on the basis that there was no "disclosure," as respondent readily concedes. But we are constrained to conclude that there has not been established by clear and convincing proof the requisite professional relationship within the meaning of the Canon or the Disciplinary Rules.

Respondent argues that "representation is inherently an aware, consensual relationship," one which is founded upon the lawyer affirmatively accepting a professional responsibility. While we agree with this contention, such acceptance need not necessarily be articulated, in writing or speech but may, under certain circumstances, be inferred

---

[2]The language of the pertinent rules is as follows:

DR 5–101. Refusing Employment when the Interests of the Lawyer May Impair His Independent Professional Judgment.

(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

DR 5–104. Limiting Business Relations with a Client

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

from the conduct of the parties. Clearly there was no articulation of a professional engagement between the Frinos and Palmieri, and so the question narrows down to whether such a relationship arose by inference.

■ In the instant case the proof is insufficient to permit us to infer the existence of an attorney-client relationship. No clear evidence demonstrates that respondent ever provided legal services in connection with the hotel transactions. No bill was ever submitted with respect to the project, although there were bills for other services, legal in nature, performed by respondent for complainants. Although these factors standing alone are not determinative, they do serve to blunt the assertion of a lawyer-client relationship sufficiently to lead us to conclude that clear and convincing evidence of the same is lacking.

Nor do we find, even in the absence of a strict attorney-client relationship, that respondent owed a fiduciary duty to the Frinos. We have recognized that even when the parties are not in the position of attorney and client, a member of the bar owes a fiduciary duty to those who he knows or should know depend on him for professional advice. *In re Hurd*, 69 *N. J.* 316, 330 (1976). However, the evidence in the proceeding before us fails to support an inference that the Frino brothers relied on Palmieri in any professional capacity in the loan and stock transaction. The history of their relationship is highlighted by the Frinos' paying scant heed to whatever business advice Palmieri may have offered in other situations.

■■ And so while it is true, as the presentment avers, that complainants reposed confidence in Palmieri, that is no more than would be expected: they were joining him in a business venture which had originated with respondent and showed promise of success if properly nurtured. The evidence certainly permits the conclusion that the Frinos shared Palmieri's hopes, approved the "grand design" of a new hotel, and in that sense trusted the business judgment of their friend and associate. But there is nothing to sug-

gest that the Frinos' reliance grew out of respondent's conduct in the premises as an attorney. Before a professional obligation is created, there must be some act, some word, some identifiable manifestation that the reliance on the attorney is in his professional capacity. We will not impose a professional obligation under these circumstances, where the reliance is plainly no more than part and parcel of a joint business venture among sophisticated businessmen.

Even were we able to conclude that the Frinos in fact relied upon Palmieri in his professional capacity, the record fails to show that respondent should have been alerted to the fact that complainants were looking to him for legal advice. Although the Committee offers *In re Hurd, supra,* in support of its position that respondent should have known that the complainants were depending on him to provide legal advice, the Committee's reliance on that opinion is misplaced. *Hurd* involved an "unconscionable" real estate transaction with a lady of over eighty years of age, totally lacking in business experience or even a rudimentary knowledge of commercial affairs. She needed advice and relied on the attorney to provide it, as he very well knew. We there noted that the relationship between the respondent and the victimized property owner was of "surpassing importance."[3] The difference between these complainants, well-

---

[3] Of surpassing importance to an understanding of today's decision is an appreciation of the relationship between respondent and the Skinner family, particularly Ethel Skinner, a lady more than eighty years of age. The Hurds and the Skinners had been close neighbors on Rector Street in Elizabeth. Mrs. Skinner had occupied the same three family home, which she shared with various relatives, for more than fifty-seven yeares. She knew all the Hurd children, including respondent and his sister, Ruth Hurd Minor, both of whom had moved from the Rector Street home prior to the events in question. Mrs. Minor furnished significant insight into the bond between the families when she told the Committee "* * * I know my mother was always in sort of an advisory capacity [to the Skinners], and I think this is what they thought of the Hurds, as something like that." While Mrs. Skinner had never consulted respondent in any legal

versed in business affairs and experienced in investing their money, could not be more striking, particularly as respects respondent's recognition of the complainants' reliance and the nature thereof. Hence the professional obligation in *Hurd* and the absence of one here.

### III

The supermarket transaction, on the other hand, demonstrates an unmistakable conflict. We accept the facts as set forth in respondent's brief:

The facts are that the Frinos accomplished a sale of their Waybest Supermarket to employees, De Meo and Iuliano. This occurred during the summer of 1969. The buyers were unable to hire one lawyer, who wanted a retainer. Another lawyer, whom they approached, passed away. With the Christmas buying season upon him and determined to shed the store, Michael Frino told the buyers to engage Mr. Palmieri or lose the deal.

Mr. Palmieri submitted, very unwillingly. He produced the sales agreement of October 22, 1969 between Waybest Super Markets, Inc., as Seller, and Joanna, Inc., as Purchaser and the DeMeos and Iulianos as guarantors. He also accomplished an extension of the store lease from the landlord Friedrich, but could not get a release of Waybest from liability under the current terms of the lease, not due to expire until June 30, 1972. Joanna went into possession and, after about 14 months, defaulted in rent and other obligations. The

matters, and the Committee quite properly concluded that an attorney-client relationship as such did not exist between them in this transaction, Calvin Hurd was the only lawyer Ethel Skinner knew. She said she "always trusted Calvin, * * * never had any reason not to, * * *" and would "trust him with [her] life."

Frieda Skinner Randolph, who with the children of her deceased daughter also occupied the premises in question, worked as a domestic for Mrs. Minor and cleaned respondent's office during the times pertinent hereto. From time to time she asked respondent for "bits of advice on one subject or another," which he readily furnished. Hence it was natural for the Skinners to turn to respondent for help when confronted with difficulties regarding the Rector Street property, and it is in the context of the existing relationship between the people involved that we appraise Hurd's conduct.

[*In re Hurd*, 68 *N. J.* 316, 318–19 (1976).]

landlord then sued both Joanna and Waybest in 1971. Michael Frino brought the suit papers to Mr. Palmieri, who proceeded to defend against the landlord. He also maintained a third party complaint on behalf of Waybest against the De Meos and Iulianos. An answering affidavit of these parties charged the Frinos with fraudulent inducement not to obtain independent counsel. This development made Mr. Palmieri a prospective witness for the Frinos, on the merits of the case, in a controverted respect. He promptly withdrew. The Frinos refused to understand why he could not continue. The result was a rift in their relationship, which became even wider as the Frinos took on Mr. Palmieri as an adversary.

Respondent's position is that neither the Canons of Professional Responsibility in 1969 nor DR5–105(C)[4] prohibited multiple representation *per se,* that the standard then as now is consent after full disclosure of the facts and pitfalls, and that there is no proof in this record of any failure to disclose, particularly as regards the Frinos.

---

[4]The Rule reads as follows:

DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In situations covered by DR 5–105(A) and (B) except as prohibited by rule, opinion, directive or statute, a lawyer may represent multiple clients if he believes that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the facts and of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment.

██ ██ While all this is doubtless true, the argument fails to meet the glaring violation found in respondent's filing a third party complaint against his former clients De Meo and Iuliano. As this Court noted in *In re Blatt,* 42 *N. J.* 522, 524 (1964), "where a member of the bar represents a litigant in a cause, he should not thereafter represent the opposing party in any step in the proceedings in or arising out of the same cause." Our more recent decision in *In re Cipriano,* 68 *N. J.* 398 (1975) points out that it is not only the potential for disclosure of confidential information which is at stake when a lawyer takes a case against a former client but also, and at least equally important, the appearance of wrongdoing. 68 *N. J.* at 403. See also *N. J. Advisory Opinion on Professional Ethics,* Opinion 391, 101 *N. J. L. J.* 209 (1978), and authorities cited therein.

It matters not that De Meo and Iuliano are not the complainants. The matter is before us and the fact of a disciplinary violation is inescapable. We need delve no further into the disputed facts of the supermarket transaction and we leave to the pending civil litigation the resolution thereof.

## IV

Respondent has retired from the private practice of law. These proceedings represent the only blot on his otherwise unblemished record. Under the circumstances the appropriate discipline is a public reprimand, hereby imposed.

*For reprimand*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.