In re A & T PARAMUS CO., INC., d/b/a International Motor Plaza and Lorel Motor Plaza, Inc., a/k/a Lorel Motor Plaza, Inc., Debtors.

No. 96–24842(RG).

United States Bankruptcy Court,
D. New Jersey.

Feb. 16, 1999.

Vecchione, P.C., Newark, NJ, for A & S Fuel Oil Co.

Leslie D. Corwin, Howard J. Berman, Greenberg Traurig, New York City, for Michael A. Saffer, Chapman, Henkoff, Kessler, Peduto & Saffer Roseland, NJ, for Dr. George Radnay and Jane Radnay.

Richard B. Honig, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for the Chapter 11 Trustee, William J. Hunt.

## OPINION

ROSEMARY GAMBARDELLA, Chief Judge.

Before the Court is a motion by Dr. George Radney and Jane Radney (the "Radneys") to disqualify the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione ("Gibbons") from representation of A & S Fuel Oil Co., Inc. ("A & S"). The Radneys argue that the Court must disqualify Gibbons on the grounds that it previously represented them, and on the grounds that its representation of A & S creates an appearance of impropriety.

In opposition to the Radneys' motion, Gibbons argues that the Radneys have waived their right to allege the existence of a conflict of interest, that, regardless of the applicability of a such a waiver, no attorney-client relationship existed between Gibbons and the Radneys, and finally that its representation of A & S does not create an appearance of impropriety.

The Court conducted a hearing concerning this matter on November 10, 1998. The following constitutes this Court's findings of fact and conclusions of law.

### FACTS

In or about December 1993, the Radneys purchased fifty percent (50%) of the common stock of A & T Paramus, Inc. d/b/a International Motor Plaza, Inc. ("Debtor"). *See* Certification of Jane Radney in Support of Motion to Disqualify Counsel ("Radney Certif.") ¶ 12. Abraham Stahl owns the remaining fifty percent

Paul R. DeFilippo, James N. Lawlor, Gibbons, Del Deo, Dolan, Griffinger &

(50%) interest in Debtor. *See id.* Debtor operates as a fuel and service station in Mahwah, New Jersey. *See id.*

Jane Radney asserts that, at the time of the Radneys' purchase of part ownership of Debtor, "Mark Stahl, the son of Abraham Stahl, was responsible for the management and operation of the Debtor's business, including the purchase and delivery of fuel" and for "securing and paying vendors such as A & S." *Id.* ¶ 13.

She asserts that "[s]ometime in late 1995 or early 1996, unbeknownst to me and my husband, Mark Stahl began giving fraudulent deposit information to A & S and began tendering bad personal checks drawn on his mother's and father's personal accounts when there were insufficient funds in such accounts to cover checks totalling [sic] approximately $478,000." *Id.* ¶ 14.

### State Court Proceedings

Prior to Debtor's petition filing, A & S filed in the Superior Court of New Jersey, Morris County a Complaint (the "A & S Action") against Debtor, the Radneys, Abraham Stahl, Esther Stahl, and Mark Stahl pursuant to which it sought to recover over one million dollars ($1,000,000.00) in damages resulting allegedly from, *inter alia,* Debtor's failure to pay for delivered fuel. *See id.* ¶ 18, Ex. 6 (copy of Amended Complaint). In its Complaint, A & S alleged that the Radneys had previously executed a guaranty of Debtor's obligations to A & S (the "Guaranty").[1] *See id.* Ex. 6 ¶ 6.

The Radneys, as alleged oppressed minority shareholders, had also filed in the Superior Court of New Jersey, Bergen County (the "State Court") a Complaint (the "Radneys' Action") against the Stahls and others for relief pursuant to N.J.S.A. § 14A:7(c). *See id.* ¶ 18 n. 6.

By order dated April 30, 1996, the State Court consolidated the Radneys' action and the A & S Action (collectively, the "State Court Action"). *See id.* ¶ 18; Ex. 8 (copy of Order of Consolidation).

On July 12, 1996, the State Court entered an order granting summary judgment to A & S with respect to its claims against Mark and Abraham Stahl, but denied the motion with respect to its claims against the Radneys. *See id.* Ex. 10 (copy of Order).

### The Meeting

On June 4, 1996, Debtor filed a petition under Chapter 11 of the United States Bankruptcy Code. *See id.* ¶ 17. Jane Radney maintains that the she and her husband are creditors of Debtor. *See id.* ¶ 1.

On September 19, 1996, the United States Trustee appointed William J. Hunt ("Hunt") as Chapter 11 Trustee of Debtor's estate. *See* Order Directing Appointment of Trustee.

On November 27, 1996, Jane Radney met with Frank Vecchione, Esq. ("Vecchione"), and Anthony La Rocco, Esq. ("La Rocco"), both members of Gibbons, to discuss the possibility of her retaining Gibbons to represent the Radneys in the State Court Action and Debtor's bankruptcy proceeding.[2] *See* Radney Certif. ¶ 3 ("I, on behalf of Dr. Radney and myself, met and consulted extensively with [Vecchione] and [La Rocco] about retaining them to assert various claims against and assert certain defenses involving A & S."); Certification of Jane Radney in Further Support of Motion to Disqualify Counsel ("Radney Response Certif.") ¶ 5 ("When I called [La Rocco] to schedule a time to meet, I told him my husband and I needed legal representation in both the bankruptcy proceeding and the State Court Action.").

---

1. Jane Radney asserts that she and her husband, Dr. George Radney, "were duped by the Stahls into signing [the Guaranty]." Radney Certif. ¶ 19.

2. The law firm was then known as Crummy, Del Deo, Dolan, Griffinger & Vecchione.

Jane Radney characterizes the meeting as "very substantive and extensive, lasting between three and four hours." Radney Response Certif. ¶ 7. She alleges, specifically, that during this meeting:

I discussed with Messrs. Vecchione and La Rocco various facts, claims, defenses and strategies. As to the present Chapter 11 case (since I was advised that Mr. Vecchione was a bankruptcy expert), I discussed the Debtor's financial problems, the Debtor's operations during the chapter 11 case and [the Radneys'] rights and interests in the Debtor. During my meeting with Mssrs. Vecchione and La Rocco, I specifically discussed with them confidential information bearing directly on [the Radneys'] defenses against A & S and the Debtor's business and transactions with A & S.

Radney Certif. ¶ 3.

Jane Radney also alleges:

I brought a "huge stack" of documents, both prior court documents and internal confidential documents I wrote to the Operational Executive of the Debtor relating, among other things, to problems with the Debtor's operations. I brought everything I had and tried not to exclude anything so the attorneys could know as much as possible about [the Radneys'] case and [the Radneys'] interests and concerns, whether confidential or not. . . . I had prepared a detailed summary of events leading up and relating to both the State Court Action and this bankruptcy proceeding. I tried to convey as much information as possible in the summary which contains substantial confidential information regarding, among other things, my and my husband's activities and certain activities of the company and its shareholder and his son, Mark Stahl. . . . Moreover, during the meeting, I conveyed to the Gibbons attorneys facts and impressions concerning our claims that [A & S] and the

other shareholder of the Debtor were acting in collusion to obtain exclusive control of the Debtor at a steeply discounted price.

Radney Response Certif. ¶¶ 7–8.[3]

Finally, Jane Radney maintains that "[her] recollection is that both Mr. Vecchione and Mr. La Rocco reviewed many of the documents [she] had brought and made extensive notes on large pads." *Id.* ¶ 9.

With respect to the meeting with Jane Radney, La Rocco asserts that "[he] only recall[s] the meeting because it occurred at an unusual time, on the eve of the Thanksgiving Holiday after normal business hours," that "[he] do[es] not recall the specific issues discussed at the meeting," and that "[he] neither kept notes nor did [he] keep any written information, if such information was even provided by Ms. Radney." Certification of Anthony P. La Rocco ("La Rocco Certif.") ¶¶ 2, 4. He also asserts that "[he] did not open a client matter, bill any time for the meeting or prepare a retainer letter as required by RPC 1.5." *Id.* ¶ 6. La Rocco maintains further that "[a]fter informing Ms. Radney of [Gibbons's] decision, [he] never spoke to either of the Radneys again" and that "[b]oth before and after December 1997, [he] never discussed any details or information with respect to the meeting with Ms. Radney with anyone at [Gibbons]." *Id.* ¶¶ 6, 8.

Vecchione asserts that he does not recall the meeting with Jane Radney. *See* Certification of Frank J. Vecchione ("Vecchione Certif.") ¶ 3. He asserts, specifically, that "[he] do[es] not recall the meeting, Ms. Radney or the details of any discussions," and that he believes that he did not receive any confidential information and that "[his] role at the meeting was simply to discuss any potential bankruptcy issues." *Id.* Vecchione also maintains that "[he does] not

---

**3.** Pursuant to the Court's request, the Radneys submitted a copy of the summary (the

"Summary") for *in camera* inspection.

recall receiving any written information related to the Radneys' cases," that "[he] kept no notes nor copies of any information related to the November 27, 1997 meeting," and that "[he has] not discussed the subject of the meeting with any other attorney at [Gibbons]." *Id.* ¶ 4.

Finally, Paul R. DeFilippo ("DeFilippo"), also a member of Gibbons, maintains that "[n]either James Lawlor nor [DeFilippo], the only attorneys working on [Debtor's] Chapter 11 case, ever discussed the subject matter of the November 1996 meeting with either Messrs. Vecchione or La Rocco." Certification of Paul R. DeFilippo ("DeFilippo Certif.") ¶ 28.

### Gibbons Assumes Representation of A & S

After the meeting, Gibbons declined to represent the Radneys. *See* Radney Certif. ¶ 4.

On April 11, 1997, Gibbons filed with this Court a Substitution of Counsel pursuant to which it assumed representation of A & S in this case. *See* DeFilippo Certif. ¶ 4, Ex. A (copy of Substitution of Counsel). DeFilippo asserts that "[a]s early as March 31, 1997, [he] informed the then-counsel for the Radneys, Ravin, Greenberg & Marks, ... that [Gibbons] would be acting as counsel for A & S." *Id.* ¶ 3.

DeFilippo alleges that "A & S has been an active participant in this case in addition to its meetings and negotiations with the Trustee, the Debtor, and the Radneys." *Id.* ¶ 8. DeFilippo asserts, for instance, that he and the Radneys' counsel, among others, conducted settlement discussions in May 1997. *See id.* ¶ 7. He asserts, also, that Gibbons filed in February 1998 a motion to convert the case, and in March 1998 an objection to a motion for a settlement of certain environmental matters. *See id.* ¶ 8. DeFilippo avers that, in each of these instances, the Radneys' failed to object to Gibbons's status as counsel for A & S. *See id.* ¶¶ 7, 9.

On or about May 21, 1997, Gibbons assumed representation of A & S in the State Court Action. *See id.* ¶ 11.

On October 2, 1997, the State Court entered an order entering default against the Radneys following their failure to appear at a pre-trial conference. *See* Order of Dismissal; DeFilippo Certif. Ex. D (copy of Order of Dismissal).

The State Court subsequently entered an order vacating the dismissal and compelling the Radneys to appear for depositions. *See* DeFilippo Certif. ¶ 15.

The Radneys failed to appear for the depositions. *See id.* ¶ 18.

In a letter dated December 16, 1997, Frank Holahan, Esq., ("Holahan") then counsel for the Radneys in the State Court Action, advised James N. Lawlor, Esq. of Gibbons of the potential impropriety of Gibbons's representation of A & S, in light of Jane Radney's prior meeting with LaRocco and Vecchione. *See* Radney Certif. Ex. 2 (copy of Letter Dated December 16, 1997).

In a letter dated December 29, 1997, DeFilippo advised Holahan of his belief that no conflict existed. *See id.* Ex. 3 (copy of Letter Dated December 29, 1997). DeFilippo asserted that, *inter alia*, LaRocco and Vecchione had been and would continue to be "Chinese-walled" from the case, and that the Radneys, having waited to object, had waived their right to assert a conflict. *See id.*

In March 1998, Gibbons withdrew as counsel for A & S in the State Court Action. *See id.* ¶ 7. DeFilippo asserts that "[a]lthough A & S and [Gibbons] considered the Radneys' allegations of a conflict to be meritless, rather than continue to engage in wasteful litigation over the conflict issue, it was determined that A & S would be better served by replacement counsel in the State Court Action." DeFilippo Certif. ¶ 19. He adds that Gibbons withdrew "with the hope that the Radneys would appear at the duly ordered depositions" and "in an effort to expedite the

discovery that was pending for more than a year." *Id.* ¶¶ 19–20.

DeFilippo emphasizes that the Radneys continued to fail to appear at depositions after Gibbons' withdrawal, resulting in the entry of a July 20, 1998 order by the State Court striking their Answer, suppressing their defenses, and dismissing their counterclaim with prejudice, as well as the entry of an order dated September 21, 1998 denying vacation of that order. *See id.* ¶¶ 21–23.

By order dated November 5, 1998, the Appellate Division reversed the order dismissing the Radneys' pleadings and reinstated their Answer and Counterclaim. *See* Letter Memorandum of Michael A. Saffer, Esq. Dated November 19, 1998.

On May 18, 1998, A & S, through Gibbons, filed a proposed Plan of Reorganization and a Disclosure Statement. *See* Radney Certif. ¶ 9.

The Radneys object to the Disclosure Statement. *See id.* ¶ 10. Jane Radney alleges that "[i]f the A & S plan is approved, [the Radneys'] equity interests in the Debtor (over one million dollars) will be wiped out and A & S, through a newly formed entity, will wind up owning the Debtor's assets while unsecured creditors will only receive 5 cents on the dollar." *Id.* She also objects on the grounds that "A & S appears to have lent the Debtor money to give A & S 'control.'" *Id.* ¶ 20.

**Radneys Move to Disqualify Gibbons**

On August 27, 1998, the Radneys filed a Notice of Motion to Disqualify Gibbons, Del Deo, Dolan, Griffinger & Vecchione From Representing A & S Fuel Oil Co. *See* Notice of Motion to Disqualify.

In support of its motion to disqualify Gibbons, the Radneys argue that the Court must disqualify Gibbons pursuant to New Jersey Rule of Professional Conduct ("RPC") 1.9. *See* Memorandum of Law in Support of Motion to Disqualify ("Radneys' Brief") at 2. They argue, specifically, that an attorney-client relationship existed between Gibbons and themselves, on the

basis of the meeting between Jane Radney and La Rocco and Vecchione, that their interests are materially adverse to A & S's interests, and that Gibbons's representation of A & S shares a "substantial relationship" with its prior representation of the Radneys. *See id.* 4–8. They also argue that Gibbons's representation of A & S raises "an appearance of impropriety." *See id.* at 9–10.

In opposition to the Radneys' motion, Gibbons argues that the Radneys have waived their right to assert the existence of a conflict of interest, that, even assuming that their motion is timely, the Radneys do not constitute "former clients" of Gibbons for the purposes of the application of RPC 1.9. and finally, that Gibbons's representation of A & S does not create an appearance of impropriety. *See* Memorandum of Law in Opposition to Motion to Disqualify Gibbons, Del Deo, Dolan, Griffinger & Vecchione From Representing A & S Fuel Oil Co., Inc. ("Gibbons's Brief").

With regard to the relationship of this case to the State Court Action, DeFilippo maintains that "[t]he litigation in the State Court between the Radneys and A & S is based upon written personal guarantees signed by the Radneys," and that "[t]he claims made by A & S in the State Court Action have no relationship to [Gibbons's] representation of A & S in this chapter 11 case." DeFilippo Certif. ¶ 25. With regard to Jane Radney's allegation that "[she] discussed the Debtor's operations during the chapter 11 case and [her] rights and interests in the Debtor," he argues in his Certification that:

> any information allegedly given by the Radneys to A & S related to [Gibbons] regarding the Debtor is not confidential information. [Debtor] is a separate legal entity from the Radneys. William Hunt, Esq. serves as Trustee for A & T, and the Radneys no longer control [Debtor's] attorney-client privilege. Thus, the Radneys decision to share such information related to [Debtor]

does not constitute disclosure of confidential information [vis-a-vis] the Radneys.

*Id.* ¶ 26 (emphasis omitted) (quoting Radney Certif. ¶ 3).

In response to Gibbons's argument that they have waived their right to seek disqualification, the Radneys argue that "they moved for disqualification promptly after learning of the adverse nature of A & S Oil's position in this bankruptcy proceeding." Reply Memorandum of Law at 9. They allege that "[i]t was the fact that A & S Oil offered the A & S Oil [proposed] Plan which prompted the Radneys to seek disqualification of Gibbons, which now represents interests adverse to the Radneys." *Id.*

## ANALYSIS

The Court addresses three issues: (1) whether the Radneys waived their right to seek disqualification of Gibbons; (2) whether the Radneys constitute "former clients" of Gibbons, and whether this case constitutes a "substantially related matter" within the meaning of RPC 1.9(a); and (3) whether Gibbons's representation of A & S creates an "appearance of impropriety" within the meaning of RPC 1.9(b).

### I. Disqualification

This Court has asserted that "[t]he provisions of the Local District Court General Rules govern the practice of attorneys in the Bankruptcy Court for the District of New Jersey." *In re Star Broadcasting, Inc.,* 81 B.R. 835, 839 (Bankr.D.N.J.1988).

Local Rule 103.1(a) for the District of New Jersey provides that "[t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law." D.N.J. L. Civ. R. 103.1(a).

In interpreting the predecessor to this rule, the United States District Court for the District of New Jersey (the "District Court of New Jersey") has stated that:

to resolve questions of professional ethics, this Court turns to New Jersey's Rules of Professional Conduct. It is clear that the intention is for practitioners in both the state and federal courts in New Jersey to be governed by a single ethical code. Nevertheless, while efforts should be made to avoid inconsistent determinations under the RPCs, and this Court may certainly look for guidance to the decisions of the New Jersey state courts, our Local Rules do not require that this Court be bound by those decisions.

*Carlyle Towers Condominium Assoc. v. Crossland Savings, FSB,* 944 F.Supp. 341, 344–45 (D.N.J.1996) (footnote omitted). *See also Essex Chemical Corp. v. Hartford Accident and Indemnity,* 993 F.Supp. 241, 246 (D.N.J.1998) ("In construing the RPC, a district court may look to the decisions of the New Jersey Supreme Court and other relevant authority."); *Kaselaan & D'Angelo Assoc. v. D'Angelo,* 144 F.R.D. 235, 237 (D.N.J.1992) ("[T]he ethical rules and constraints imposed on federal practitioners in New Jersey are the same as those imposed on New Jersey attorneys generally by the state Supreme Court.") (quoting A. Lite, New Jersey Federal Practice Rules (1992 ed.) at 31–32).

Thus, in determining whether to grant or deny the Radneys' motion to disqualify Gibbons, this Court applies New Jersey's Rules of Professional Conduct.

In addressing a motion to disqualify, the *Carlyle* Court recognized that: "[m]otions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure' which courts should hesitate to impose except when absolutely necessary." *Alexander v. Primerica Holdings, Inc.,* 822 F.Supp. 1099, 1114 (D.N.J.1993) (citing *Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir.

1983)). "[D]isqualification motions are often made for tactical reasons, but ... 'even when made in the best of faith, such [disqualification] motions inevitably cause delay' in the underlying proceedings." *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 218, 536 A.2d 243 (1988). Therefore, close judicial scrutiny of the facts of each case is "required to prevent unjust results." *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F.Supp. 1121, 1126 (N.D.Ohio 1990). *Carlyle*, 944 F.Supp. at 345. *See also Essex*, 993 F.Supp. at 246 ("Although doubts are to be resolved in favor of disqualification, a party seeking to disqualify counsel carries a heavy burden and must satisfy a high standard of proof.").

## II. Waiver

In this case, the Radneys argue that the Court must disqualify Gibbons pursuant to RPC 1.9. *See* Radneys' Brief. Before addressing the applicability of RPC 1.9, however, the Court must first address the issue of whether the Radneys have waived their right to object to Gibbons's status as A & T's counsel.

In *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1101 (D.N.J.1993), the District Court of New Jersey addressed the issue of whether a party had waived the right to seek disqualification of an opponent's counsel. In their complaint filed in December 1989, retired employees of a corporation's predecessor had alleged that the corporation had violated the Employee Retirement Income Security Act. *See id.* at 1102. In January 1993, after the parties had litigated a motion for summary judgment and a motion for a preliminary injunction, and had conducted discovery, the plaintiffs raised the issue of disqualification of the defendant's counsel. *See id.* at 1108. In March 1993, the plaintiffs formally moved to disqualify the defendant's counsel on the grounds that such counsel had also represented some of the plaintiffs in other matters. *See id.* at 1109–1113. In opposing the motion, the defendant argued that the plaintiffs had waived their right to seek disqualification in light of their delay in pursuing such relief. *See id.* at 1114.

The *Alexander* Court first recognized that:

Waiver is a valid basis for the denial of a motion to disqualify. [*Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1208 (E.D.Pa.1992)]; *Zimmerman v. Duggan*, 81 B.R. 296, 300 (E.D.Pa.1987); *INA Underwriters Ins. Co. v. Nalibotsky*, 594 F.Supp. 1199, 1204 (E.D.Pa.1984); *Jackson v. J.C. Penney Co.*, 521 F.Supp. 1032, 1034–35 (N.D.Ga.1981). As the *Commonwealth Ins.* court stated:

[A] finding [of waiver] is justified ... when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity. In [this] circumstance, the person whose confidences and secrets are at risk of disclosure or misuse is held to have waived his right to protection from that risk.

808 F.Supp. at 1208.

*Id.* at 1115 (footnote and citations omitted).

The *Alexander* Court continued:

[i]n determining whether the moving party has waived its right to object to the opposing party's counsel, consideration must be given to (1) the length of the delay in bringing the motion to disqualify, (2) when the movant learned of the conflict, (3) whether the movant was represented by counsel during the delay, (4) why the delay occurred and (5) whether disqualification would result in prejudice to the non-moving party. *Commonwealth Ins.*, 808 F.Supp. at 1208. In particular, consideration should be given and inquiry made as to whether the motion was delayed for tactical reasons.

*Id.*

In applying these factors to the case, the *Alexander* Court found that the plaintiffs

had waived their right to object to the defendant's counsel. *See id.* at 1115–20. With respect to the issue of timing, the court found that "all facts which underlie this motion were known to [the plaintiffs] from the start of this litigation." *Id.* at 1115. It found, specifically, that the plaintiffs had been aware of the alleged conflicts of interest since the inception of the case. *See id.* at 1115–1117.

The *Alexander* Court also considered the potential prejudice to the defendant. *See id.* at 1117–18. It noted that "[a] significant factor in the waiver/estoppel analysis is the prejudice which, as a result of a substantial delay, would inure to the non-movant if the motion for disqualification is granted" and that "[w]hen that prejudice would be great, courts have not granted motions to disqualify." *Id.* at 1117. The court found that the defendant's counsel "[had] handled all aspects of the case for [the defendant] and [had] engaged in substantial pre-trial preparation." *Id.* It also recognized that counsel "[had] devoted thousands of hours to this litigation and [the defendant had] invested hundreds of thousands of dollars in its defenses," and that "at this late stage in the litigation, it is doubtful that [the defendant] could find capable substitute counsel without substantial delay." *Id.* at 1118. On these bases, the *Alexander* Court found that "all of this preparation, as well as the economic investment, would be unfairly lost to [the defendant] if [its counsel] were not allowed to continue in this case." *Id.*

Finally, the *Alexander* Court considered the purpose of the plaintiffs' motion. *See id.* at 1118–19. It noted that "[w]hen a motion to disqualify appears to have been made primarily for strategic purposes or would provide the movant with undue tactical advantage, courts 'have been extremely reluctant to disqualify attorneys.'" *Id.* (quoting *Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F.Supp. 418, 430–31 (D.Del.1986)). In evaluating the plaintiffs' motives in seeking disqualification,

the court considered their timing in bringing the motion. *See id.* at 1119. It also found that the plaintiffs had previously expressed a desire for expeditious resolution of the case, and stated that "[n]ow, however, [the plaintiffs] have lost their sense of urgency and seek to delay a resolution of this case substantially and indefinitely by requiring [the defendant] to obtain new counsel." *Id.* The court also cited recent discovery "which appear[ed] to significantly damage [the plaintiffs'] case." *Id.* at 1119–20. Thus, the court found that "[t]his motion has every appearance of a motion brought for the purpose of obtaining an unfair tactical advantage over [the defendant]." *Id.* at 1119.

The *Alexander* Court concluded that:

[a]ccordingly, the motion to disqualify [the defendant's counsel] is denied. The motion appears to have been filed for the purpose of gaining for [the plaintiffs] an undeserved tactical advantage over [the defendant]. Moreover, even if this motion were brought in the best of faith, the unreasonable three year delay in raising these issues, as well as the significant prejudice to [the defendant] that would follow from the disqualification of [counsel], compel denial of the disqualification motion. Simply put, [the plaintiffs] could have and should have raised these issues at the commencement of this litigation. Because they waited three years to do so, they have waived their opportunity to disqualify [counsel]; because for three years [the defendant] has detrimentally relied on [the plaintiffs'] silence, [the plaintiffs] are estopped from asserting those grounds for disqualification.

*Id.* at 1120 (footnotes omitted). *See also Chemical Waste Management, Inc. v. Sims*, 875 F.Supp. 501, 505 (N.D.Ill.1995) (finding that party had waived right to object to opposing counsel where party had "consistently dealt" with that counsel during settlement discussions and where disqualification would result in prejudice); *Freeman v. Vicchiarelli*, 827 F.Supp. 300,

303–04 (D.N.J.1993) ("Courts encourage litigants to move to disqualify as soon as they recognize ethical conflicts; this practice discourages strategic procedural behavior and mitigates the amount of time and money spent before applying ethical rules of conduct.").

■ In this case, Jane Radney met with La Rocco and Vecchione on November 27, 1996 to discuss the possibility of the Radneys' retention of Gibbons in the State Court Action. *See* Radney Certif. ¶ 3. After declining to represent the Radneys, Gibbons assumed representation of A & S in this case in April 1997, and in the State Court Case in May 1997. *See* DeFilippo Certif. ¶¶ 4, 11. In December 1997, counsel for the Radneys advised Gibbons of the potential impropriety of such representation. *See* Radney Certif. Ex. 2 (copy of Letter Dated December 16, 1997). Gibbons remained, however, as counsel for A & S in this case, and has maintained a fairly conspicuous presence. For instance, in May 1997, Gibbons conducted settlement discussions with counsel for the Radneys. *See* DeFilippo Certif. ¶ 7. Moreover, in early 1998, Gibbons filed a motion to convert the case and an objection to a motion for the settlement of certain environmental matters. *See id.* ¶ 8. In March 1998, Gibbons withdrew as counsel for A & S in the State Court Case. *See id.* ¶ 7. On May 18, 1998, A & S, through Gibbons, filed a proposed plan of Reorganization and a Disclosure Statement. *See id.* ¶ 9.

Despite such activity on the part of Gibbons, the Radneys failed to object to its status as counsel for A & S in this case. In fact, the Radneys did not file its motion to disqualify until August 1998, following A & S's filing of a proposed Plan of Reorganization to which they object.[4] Under these circumstances, this Court, in applying the *Alexander* factors, finds that the Radneys have waived their right to seek disqualification of Gibbons. First, as in *Alexander*, "all facts which underlie this motion were known ... from the start of this litigation." *Alexander*, 822 F.Supp. at 1115. It is inconceivable that the Radneys were not aware, from the outset, of Gibbons's status as A & S's counsel. Indeed, DeFilippo specifically alleges that "[a]s early as March 31, 1997, [he] informed the then-counsel for the Radneys, Ravin, Greenberg & Marks, ... that [Gibbons] would be acting as counsel for A & S." DeFilippo Certif. ¶ 3. Thus, the Radneys knowingly waited nearly a year and a half before objecting.

The Court also notes that the Radneys were represented by counsel during this delay. In fact, in December 1997, Holahan, then counsel for the Radneys in the State Court Action, advised Gibbons of the potential impropriety of Gibbons' representation of A & S. *See* Radney Certif. Ex. 2 (copy of Letter Dated December 16, 1997). Although it withdrew from the State Court Case, Gibbons continued to represent A & S in this case. The Radneys proffer no reason for their failure to timely proffer a formal objection to such representation.

The Court also recognizes "the prejudice which, as a result of a substantial delay, would inure to the non-movant if the motion for disqualification is granted." *Alexander*, 822 F.Supp. at 1117. As noted, by August 1998, Gibbons had represented A & S in this case for a span of approximately seventeen months, during which it conducted, *inter alia*, settlement discussions and motion practice, and filed a proposed plan. Thus, Gibbons has invested considerable time and resources in this litigation. Further, A & S has no doubt invested a significant amount of money in this case. Thus, as in *Alexander*, "all of this preparation, as well as the economic investment,

---

4. Jane Radney alleges that "[i]f the A & S plan is approved, our equity interests in the Debtor (over one million dollars) will be wiped out and A & S, through a newly formed entity, will wind up owning the Debtor's assets while unsecured creditors will only receive 5 cents on the dollar." Radney Certif. ¶ 10. She also objects on the grounds that "A & S appears to have lent the Debtor money to give A & S 'control.'" *Id.* ¶ 20.

would be unfairly lost ... if [counsel] were not allowed to continue in this case." *Id.* at 1118.

Finally, the Court considers the Radneys' motives in seeking disqualification. The Court acknowledges, again, that the Radneys waited nearly a year and a half before filing their motion. The Court also notes that the Radneys did not object until *after* A & S had filed a proposed plan, pursuant to which, they contend, "[their] equity interests in the Debtor (over a million dollars) will be wiped out and A & S, through a newly formed entity, will wind up owning the Debtor's assets." Radney Certif. ¶ 10. It is possible that the Radneys' current discomfort derives more from their treatment under this plan, rather than from any perceived conflict of interest. Under these circumstances, the Court finds that the Radneys' motion, like the plaintiffs' motion in *Alexander*, "has every appearance of a motion brought for the purpose of obtaining an unfair tactical advantage." *Alexander*, 822 F.Supp. at 1119.

Accordingly, the Court denies the Radneys' motion to disqualify. The Radneys appear to have filed their motion for the purpose of gaining some undeserved tactical advantage over A & S. At any rate, even if the Radneys' *had* brought their motion in the best of faith, their unreasonable delay in filing the motion, coupled with the prejudice to A & S that would result from disqualification, warrant denial of the motion. Having informally objected in December 1997 to Gibbons' role as A & S's counsel, the Radneys could also easily have formally objected at that time. Because they waited to so object, and because A & S has relied on the Radneys' seeming acquiescence to the state of affairs, the Court holds that the Radneys waived their right to disqualify Gibbons.

### III. Former Clients/Substantial Relationship

Even assuming *arguendo* that the Radneys did not waive their right to seek disqualification, the Court finds that the parties had *not* established an attorney-client relationship by virtue of the meeting between Jane Radney and La Rocco and Vecchione.

RPC 1.9 provides in relevant part:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

RPC 1.9(a).

▆▆ Thus, in order to apply RPC 1.9 in this case, the Court must first find that the Radneys constitute "former clients" for the purposes of the rule. The Supreme Court of New Jersey has held that "[b]efore a professional obligation is created, there must be some act, some word, some identifiable manifestation that the reliance on the attorney is in his professional capacity." *In re Palmieri*, 76 N.J. 51, 60, 385 A.2d 856 (1978). *See also Comm. on Prof'l Ethics v. Johnson*, 447 F.2d 169, 174 (3d Cir.1971) ("An attorney-client relationship is one of agency and arises only when the parties have given their consent, either express or implied, to its formation."); *Procanik v. Cillo*, 226 N.J.Super. 132, 146, 543 A.2d 985 (App. Div.1988) ("It is clear that an attorney must affirmatively accept a professional undertaking before the attorney-client relationship can attach, whether his acceptance be by speech, writing, or inferred from conduct."), *certif. denied*, 113 N.J. 357, 550 A.2d 466 (1988). *Cf. In re Berkowitz*, 136 N.J. 134, 145, 642 A.2d 389

(1994) (finding that attorney had represented a corporation in connection with a certain residential development on the basis of "[the attorney's] relationship with [the corporation] as corporate counsel, his indication that he would look into the matter, and [the corporation principal's] apparent reliance on his anticipated advice."); *In re Schwartz,* 99 N.J. 510, 516, 493 A.2d 1248 (1985) (finding that attorney-client relationship commenced upon attorney's filing of notice of appeal on behalf of client, and not upon receipt of retainer, where client relied upon his representations, and attorney failed to express reservations or conditions of representation). Here, the Radneys do not dispute that Gibbons affirmatively declined to represent them. *See* Radney Certif. ¶ 4. Nor do the Radneys argue that they relied on Gibbons in its professional capacity. Thus, an "identifiable manifestation" of consent to the formation of an attorney-client relationship is sorely lacking.

The Radneys nevertheless cite *Herbert v. Haytaian,* 292 N.J.Super. 426, 678 A.2d 1183 (App.Div.1996). *See* Radneys' Brief at 5–7. The *Herbert* Court asserted that "[t]he creation of an attorney-client relationship does not rest on whether the client ultimately decides not to retain the lawyer or whether the lawyer submits a bill." *Herbert,* 292 N.J.Super. at 436, 678 A.2d 1183. The Radneys cite this statement in support of their argument that they had established an attorney-client relationship by virtue of Jane Radney's meeting and alleged exchange of confidential information with La Rocco and Vecchione. *See* Radneys' Brief at 7. They argue that Gibbons's ultimate decision to decline representation does not bear on the issue of whether such a relationship was in fact created. *See id.* at 7. The Radneys neglect to mention, however, that the *Herbert* Court also held that "[w]hen ... the prospective client requests the lawyer to undertake the representation, the lawyer agrees to do so and preliminary conversations are held between the attor-

ney and client regarding the case, then an attorney-client relationship is created." *Herbert,* 292 N.J.Super. at 436, 678 A.2d 1183. Here, as noted, Gibbons declined to undertake representation of the Radneys. Moreover, it is not clear from the record whether the Radneys ever in fact requested Gibbons to undertake such representation. Thus, due to the parties' lack of agreement or consent with respect to the issue of their relationship, the Court finds that an attorney-client relationship was *not* created, and concomitantly, that the Radneys do not constitute former clients of Gibbons for the purposes of RPC 1.9.

■ Further, with regard to the existence of a "substantial relationship" under RPC 1.9, the Court recognizes that *Carlyle* Court held that:

> [t]he phrase "substantially related" has been interpreted by some courts to require a relationship between the factual issues of the case. *See, e.g., Ciba–Geigy Corp. v. Alza Corp.,* 795 F.Supp. 711, 716 (D.N.J.1992) (finding factual differences between the litigations in question which precluded disqualification). Other courts have examined the identity of the legal issues involved. *See, e.g., Steel v. Gen. Motors Corp.,* 912 F.Supp. 724, 735 (D.N.J.1995) ("Disqualification is mandated where 'the issues between the former and present suits are practically the same or where there is a 'patently clear' relationship between them.' "); *Kaselaan & D'Angelo Assoc. v. D'Angelo,* 144 F.R.D. 235, 240 (D.N.J.1992) (same); *Reardon v. Marlayne, Inc.,* 83 N.J. 460, 472, 416 A.2d 852 (1980) (same).

\* \* \*

The "substantial relationship" test adopted by the *Reardon* court, and followed in *Kaselaan & D'Angelo,* as well as in other cases, indicates that "a substantial relationship between matters will exist where the 'adversity between the interests of the attorney's former and present clients ... has created a

climate for disclosure of relevant confidential information.[']" *Reardon,* 83 N.J. at 472, 416 A.2d 852. *See Kaselaan & D'Angelo,* 144 F.R.D. at 239 (citing *Reardon*).

In discussing a prior New Jersey case, the *Kaselaan & D'Angelo* court noted that having confidential information there meant having had access to the prior client's "claims and litigation philosophy, its methods and procedures for defending claims and litigation, and its information regarding the administration of various business operations." *Kaselaan & D'Angelo,* 144 F.R.D. at 241 (discussing *Gray v. Commercial Union Ins. Co.,* 191 N.J.Super. 590, 468 A.2d 721 (App.Div.1983)). That court further indicated that in *Gray,* "plaintiff's attorney could use such information to the substantial disadvantage of his former client Commercial Union." *Id.* *Carlyle,* 944 F.Supp. at 350–51 (citations omitted).

Here, Jane Radney alleges that she imparted to La Rocco and Vecchione "confidential information bearing directly on [the Radneys'] defenses against A & S and the Debtor's business and transactions with A & S." Radney Certif. ¶ 3. Although she does not identify any disclosed information "bearing directly on [the Radneys'] defenses against A & S," Jane Radney does allege that she provided La Rocco and Vecchione with "[a] summary which contains substantial confidential information regarding, among other things, my and my husband's activities and certain activities of the company and its shareholder and his son, Mark Stahl." Radney Response Certif. ¶ 8.

 The Summary contains only a rough outline of the Radneys' involvement with Debtor, however. It does *not* contain information concerning the Radneys' "claims and litigation philosophy" or "its methods and procedures for defending claims and litigation." *Carlyle,* 944 F.Supp. at 351. Moreover, while it does describe Debtor's financial difficulties, the Summary does not contain information regarding the administration of Radneys' "business operations."[5] *See id.* Finally, the information simply cannot be characterized as "confidential" or "privileged" in nature, as much of it is recounted here. Indeed, it does not constitute information that Gibbons "could use ... to the substantial disadvantage" of the Radneys. *See id.* (quoting *Kaselaan,* 144 F.R.D. at 241). Thus, because the Radneys cannot prove that Jane Radney provided Gibbons with information regarding their litigation philosophy, their methods and procedures for defending claims, or the administration of their business operations, the Court finds that Gibbons did not receive confidential information under the *Carlyle* Court's standard. *See id.* Accordingly, because Gibbons did not receive confidential information, the Court also finds that "a climate for disclosure of relevant confi-

---

5. Jane Radney approached Vecchione and La Rocco to discuss only the possibility of her retaining Gibbons to represent the Radneys. *See* Radney Response Certif. ¶ 5 ("When I called [La Rocco] to schedule a time to meet, I told him my husband and I needed legal representation in both the bankruptcy proceeding and the State Court Action."). They did *not* discuss the possibility of Gibbons representing Debtor. *See generally* Radney Certif.; Radney Response Certif. Thus, to the extent that the Summary contains information regarding the administration of *Debtor's* operations, such information is not privileged for the purposes of the determination of this matter. Moreover, even assuming *arguendo* that Jane Radney, in her capacity as a part owner or principal of Debtor, *had* approached Vecchione and La Rocco to discuss the possibility of Gibbons representing Debtor, the Court notes that Hunt, Debtor's Chapter 11 Trustee, controls Debtor's attorney-client privilege. *See generally Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 354, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("[W]e conclude that vesting in the trustee control of the corporation's attorney-client privilege most closely comports with the allocation of the waiver power to management outside of bankruptcy without in any way obstructing the careful design of the Bankruptcy Code."). Therefore, only Hunt can assert that such information is privileged, and he has not invoked that privilege.

dential information" has not been created, and concomitantly, that the Radneys have failed to meet the substantial relationship test as defined by the *Reardon* Court. *See Reardon*, 83 N.J. at 472, 416 A.2d 852.

In so ruling, the Court recognizes that both La Rocco and Vecchione assert that they recall few, if any, specifics concerning the meeting. La Rocco alleges, specifically, that "[he does] not recall the specific issues discussed at the meeting" and that "[he] neither kept notes nor did [he] keep any written information, if such information was even provided by Ms. Radney." La Rocco Certif. ¶ 4. Moreover, Vecchione maintains that he does not recall the meeting, and that he did not receive any confidential information. *See* Vecchione Certif. ¶ 3.

## IV. Appearance of Impropriety

Finally, the Court finds that Gibbons's representation of A & S does not create an appearance of impropriety within the meaning of RPC 1.9.

RPC 1.9(b) provides that "[t]he provisions of RPC 1.7(c) are applicable as well to situations covered by this rule." RPC 1.9. RPC 1.7(c) provides in relevant part:

(c) This rule shall not alter the effect of case law or ethics opinions to the effect that:

\* \* \*

(2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

RPC 1.7(c).

■ In construing RPC 1.9(b), the District Court of New Jersey has asserted:

New Jersey federal and state courts have consistently held that the appearance of impropriety doctrine is intended not to prevent any actual conflicts, but rather to "bolster the public's confidence in the integrity of the legal profession." Thus, whether an appearance of impropriety exists must be determined from the viewpoint of informed and concerned citizens. Essentially, the analysis requires a careful examination of all relevant facts and circumstances to ascertain what a reasonable person would find proper or improper, and whether any legitimate purpose would be served by disqualification. Given the extreme nature of disqualification and the tendency of such a remedy to undermine public confidence in the litigation process, the appearance must be "something more than a fanciful possibility"; it must have a reasonable basis in fact.

*Essex*, 993 F.Supp. at 253 (citations omitted). *See also Ciba–Geigy*, 795 F.Supp. at 719 (declining to find appearance of impropriety in case in which two successive matters in question were not substantially related, and in which firm had represented former client only in "discrete litigation"); *McCarthy v. John T. Henderson, Inc.*, 246 N.J.Super. 225, 232–35, 587 A.2d 280 (App. Div.1991) (finding no appearance of impropriety in case in which parties alleging conflict did not constitute "former clients" of firm within meaning of RPC 1.9, and in which firm did not obtain information "of the nature that could be used to [those parties'] disadvantage"). *Cf. In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 477 (3d Cir.1998) ("To allow disqualification merely on the 'appearance of impropriety' indeed would allow 'horrible imaginings alone' to carry the day.").

■ In this case, the Radneys, as noted, do not constitute former clients of Gibbons for the purposes of RPC 1.9. Moreover, the parties' actions in this case have not created a climate for disclosure of relevant confidential information. Under these circumstances, and in light of the extreme nature of disqualification, the Court finds that a reasonable person would

conclude that Gibbons's representation of A & S poses no substantial risk of disservice to either the public interest or the interest of one of the parties, and that the alleged appearance of impropriety amounts to nothing more than a "fanciful possibility."

## CONCLUSION

Accordingly, the Radneys' Motion to Disqualify Gibbons, Del Deo, Dolan, Griffinger & Vecchione From Representing A & S Fuel Oil Co. is DENIED.

An order in accordance with this Opinion shall be submitted.